[No. S009924. Aug. 21, 1997.]

THE PEOPLE, Plaintiff and Respondent, v.
DRAX QUARTERMAIN, Defendant and Appellant.

## COUNSEL

Fern M. Laethem, State Public Defender, under appointment by the Supreme Court, Wilbur H. Haines III and R. Brewster Thompson, Deputy State Public Defenders, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Ronald S. Matthias and Sharon G. Birenbaum, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KENNARD, J.**—A jury convicted defendant Drax Quartermain of conspiring to murder and murdering Ronald Ewing. (Pen. Code, §§ 182, 187.) It also found true the special circumstance allegation of murder for financial gain (*id.*, § 190.2, subd. (a)(1)) and the allegation that defendant had personally used a firearm in the commission of the murder (*id.*, § 12022.5). At the penalty phase, the jury returned a verdict of death. Defendant's appeal to this court is automatic. (*Id.*, § 1239, subd. (b).)

Before trial, defendant waived his constitutional right to remain silent and gave a statement to the prosecutor after the prosecutor agreed not to use the statement in court. At trial, however, the prosecutor breached this agreement and used the many contradictions between defendant's statement and his testimony to impeach defendant's credibility. Under the controlling United States Supreme Court precedents, the prosecutor's use of the statement in breach of the agreement with defendant was fundamentally unfair and a violation of defendant's federal constitutional right to due process of law.

(U.S. Const., 14th Amend.) Because we cannot conclude beyond a reasonable doubt that the error was harmless, we reverse the judgment in its entirety.

FACTUAL AND PROCEDURAL HISTORY

I.  *Guilt Phase—Prosecution's Case*

The prosecution presented evidence of the following events leading up to the May 8, 1984, death of Ronald Ewing. In late 1983, Ewing had established a business in Sausalito selling worthless Alaskan oil and gas leases over the telephone to unsuspecting investors.

Sometime in late 1983 or early 1984, Michael Anthony, who was previously acquainted with Ewing, contacted Ewing concerning a business Anthony had started to sell gold and other precious metal investments over the telephone. Anthony's business, which he had started with Ronald McIntosh, was called First International Trading Company (FITC). During this time, Anthony and McIntosh were on parole after being convicted of federal crimes.

Ewing provided Anthony with a loan to fund FITC's operations, subleased office space to FITC, and transferred some of his salespersons to work for FITC. Ewing received a percentage of FITC's sales in return. FITC grew rapidly in the first half of 1984, while Ewing's business declined and had closed by April 1984.

Ewing and Anthony were chronic cocaine users, as was much of FITC's staff with the exception of McIntosh. Ewing and Anthony had a contentious relationship and frequently argued about money that Ewing believed Anthony owed him. Anthony in turn wished to discontinue paying a percentage of FITC's sales to Ewing. In their arguments, they threatened each other with physical violence. At some point, Ewing began to threaten that if his demands were not met he would inform the Wall Street Journal and otherwise publicize the involvement of Anthony and McIntosh, as convicted felons, in FITC. Anthony told his girlfriend that Ewing was blackmailing him; once when Anthony and his girlfriend were high on cocaine and imagined that Ewing was prowling around the house they were in, he told her that before Ewing had the chance to do anything to him he would kill or "take care of" Ewing.

Defendant Drax Quartermain and David Younge met at the Federal Correctional Institution (FCI) in Pleasanton, California. Defendant and

Younge were both convicted federal felons in the federal witness protection program, had extensive criminal records, and had testified as prosecution witnesses in federal criminal proceedings. By 1984, defendant and Younge had been paroled; Younge had established a company called Devereaux Capital Corporation with drug money that he was permitted to retain as part of his federal plea agreement. Younge was president of Devereaux Capital and he hired defendant as a consultant. Younge also became a principal witness against defendant.

Younge testified that one day in January or February 1984, while defendant and Younge were lunching at a San Francisco restaurant, they encountered Anthony and McIntosh. Anthony told them of his involvement in the "gold business" through FITC. Younge concluded that FITC was a "scam" and he decided to try to persuade Anthony to use Devereaux Capital to transfer FITC's earnings to foreign bank accounts. Several weeks later, Younge and defendant met with Anthony and McIntosh at FITC's offices. During the course of their discussion, Younge proposed that Anthony and McIntosh use Devereaux Capital's foreign bank accounts.

Younge, defendant, Anthony, and McIntosh met again for lunch soon thereafter. Younge had concluded that FITC was taking money from investors for the purpose of purchasing gold but was not actually purchasing any gold. He proposed to Anthony and McIntosh that FITC use Devereaux Capital both to purchase gold on FITC's behalf and to obtain loans using the gold as collateral.

A week or two later, defendant told Younge that Anthony and McIntosh were not interested in using Devereaux Capital's foreign banking services but that they wanted to hire defendant to kill a man who was their partner. Younge replied that he did not want to get involved. Nevertheless, Younge accompanied defendant to a meeting with Anthony and McIntosh at the Cannery in San Francisco. When defendant and Younge arrived, defendant and McIntosh went off by themselves and talked for five or ten minutes. After defendant rejoined Younge, they departed. Defendant told Younge that McIntosh had offered him $55,000 to kill Ewing and that he had agreed to do so.

Sometime thereafter, defendant invited Younge and their respective girlfriends to a restaurant to celebrate defendant's receipt of a down payment of $20,000 or $25,000 on the contract to kill Ewing. Defendant paid for dinner, a fact confirmed by defendant's girlfriend and described by her as "unusual," although she understood the purpose of the dinner to be to celebrate Younge's birthday. Younge's girlfriend also confirmed that defendant paid

for this dinner. After receiving the down payment, defendant bought an Alfa Romeo convertible automobile for $6,000 or $7,000 in cash and paid back a $6,000 loan from Younge.

Younge then accompanied defendant on two separate trips to a Mill Valley restaurant, Strawberry Mac's, to observe Ewing in preparation for the murder. Anthony and McIntosh were to bring Ewing to the restaurant so that defendant could observe his features and be able to identify him later. On the first occasion, April 25, 1984, only Anthony appeared at the restaurant, telling defendant and Younge that Ewing would not be coming.

Ewing's wife testified that he had her call Strawberry Mac's on April 25 and page Anthony to tell Anthony that Ewing would be late because Ewing was having car trouble. When Ewing returned home later that day, he showed his wife a $17,000 check from FITC.

Younge testified that he and defendant went to Strawberry Mac's a second time. On that occasion, Anthony and McIntosh appeared with Ewing and, without acknowledging defendant or Younge, gave them the opportunity to observe Ewing.

Ewing's former girlfriend testified that on May 7, 1984, the day before Ewing was killed, he told her that he had worked out an arrangement with Anthony and McIntosh and they would be paying him $30,000 to end their business relationship and that he would be moving to Los Angeles. Ewing told her he would be meeting with Anthony and McIntosh that night to finalize the transaction.

On the night of May 7, Ewing called his wife three times; in the last call, about midnight, he told her that he was at a bar in Mill Valley with Anthony and would soon leave for her apartment in San Francisco. He sounded to her like he had been drinking or using drugs. At 1:00 or 1:30 a.m. on May 8, Ewing and Anthony appeared at the Corte Madera apartment of an FITC employee, seeking cocaine. The employee gave them some cocaine, Anthony made a telephone call, and then he and Ewing left. Anthony told the employee that he and Ewing were going to meet some women and maybe get cocaine. The employee's telephone records showed that a telephone call was placed at 1:40 a.m. on May 8, 1984, from the employee's telephone to a Denny's restaurant in Pacifica.

Waiting at that restaurant that night was defendant. According to a waitress who went on duty at midnight, defendant arrived around 2:00 a.m. He ordered a cup of coffee and then went to the restroom. While he was in

the restroom, the waitress received a telephone call for him from "Mike." When defendant returned from the restroom, she handed him the telephone. After taking the telephone call, defendant left the restaurant, telling the waitress he would be back to meet his friends.

About half an hour later, Anthony and Ewing came into Denny's. The waitress concluded from their behavior that they were under the influence of cocaine. They ordered some food at 3:10 a.m. At some point, Anthony made a telephone call. Thirty to forty minutes after the arrival of Anthony and Ewing, defendant returned to the restaurant. Defendant then went in and out of the restaurant several times and made a telephone call. Around 4:00 a.m., all three men departed.

Deborah Chandler, an acquaintance of defendant, also went to Denny's that night, although she never made it inside the restaurant. Chandler testified that sometime before May 1984 defendant had told her that he had been approached by two persons who wanted him to kill a third person. About a week before May 8, 1984, Chandler accompanied defendant to buy some cocaine in San Francisco; they also took a trip to an office building in Marin County where defendant briefly went inside. On the night of May 7, defendant called Chandler at her home in San Jose and asked her to pick him up at Denny's in Pacifica. She drove there in a car she had previously rented in Oakland.

Telephone records showed defendant made numerous telephone calls to Chandler and FITC on May 7, 1984. Defendant called FITC at 6:46 a.m. and Chandler at 10:45 a.m. Defendant then called FITC at 1:24 p.m.; immediately thereafter, he called Chandler. He called Chandler again at 4:02 p.m. and 4:09 p.m., after which Chandler immediately called Thrifty Rent-a-Car in Oakland. She promptly called defendant back. Defendant called FITC again at 6:45 p.m., and shortly thereafter called Chandler again. Defendant again called Chandler at 7:04 p.m., 7:07 p.m., and 9:48 p.m. He called McIntosh at 10:02 p.m. and Denny's in Pacifica at 10:49 p.m.

When Chandler arrived at Denny's, defendant met her at the door and directed her back to his car. They got into defendant's car and departed, with Chandler driving. After she had driven for a short period, defendant told her to pull over in a large turnout and stop. She did so, turning the car so that it was facing the direction from which they had come. A Corvette with two persons in it pulled into the turnout and parked behind them, facing the same direction. (Other testimony established that Anthony had a Corvette and was driving it that night.) The engines and the lights of both cars then were turned off.

Chandler testified that defendant got out of the car and walked back towards the Corvette. She remained in his car, smoking a cigarette with the window partially rolled down. She heard voices talking outside. Some persons approached the driver's side of the car; Chandler glanced at them but did not focus her attention on them. Chandler then heard a number of gunshots coming from her left and saw a flash. She started the car and turned on the headlights; a man walked in front of her headlights, turned around, raised his hands, and said "Help me, Mike." She saw three persons outside her car: defendant, the man who walked in front of her headlights, and another man. She started to leave, but stopped when defendant spoke to her. Defendant got into the car and they left.

Chandler and defendant drove for a time, stopped once to get oil for the car, and stopped again. During the second stop, the location of which Chandler could not identify, defendant got out of the car for a minute or two. They then went back to Denny's parking lot and transferred from defendant's car to Chandler's rental car. Defendant and Chandler drove back to the apartment in San Francisco where defendant was staying. After going inside briefly, they returned to the car and drove back to the site of the shooting. When they arrived there, it was light and Chandler could see that it was a beach area. They saw a lot of activity and many official vehicles there, so they drove past, turned around, and went home. At some point after the shooting that morning, defendant told Chandler that he could not believe that the person who was shot did not just lie down.

That same morning, May 8, 1984, Ewing's partially disrobed body was found in the surf at Montara Beach. Ewing had been shot four times with a .38-caliber gun and had died from the gunshot wounds. His body was found about 200 yards from an indentation in the sand at the base of a cliff. Near the indentation were a shirt, pants, and shoes, as well as Ewing's wallet, business cards, pocket directory, and other papers. The shirt and pants were bloodstained and there were bullet holes in the shirt.

Younge testified that he left San Francisco on the morning of May 7, 1984, on a trip to Oregon. When he returned, he spoke to defendant, who told him that he had killed the partner of the "gold guys" and had left the body in the ocean. Defendant told Younge that he had arranged to meet Anthony and Ewing at a restaurant south of San Francisco, ostensibly to sell them drugs, and that defendant was then to take Ewing out of the restaurant and shoot him. Defendant told Younge that it had not gone as planned but that he had ultimately killed Ewing. Defendant told Younge that, after defendant shot Ewing once, "he wouldn't die" and Ewing had kept saying, "Mike, where are you?" Defendant also told Younge that a woman named "Debbie" had accompanied him the night of the murder.

Soon thereafter, Younge terminated defendant's employment, although he continued to lend money to defendant occasionally. Defendant told Younge that Anthony and McIntosh still owed him money for killing Ewing, and Younge drove defendant to two meetings with McIntosh at which defendant attempted to collect the money owed him. After one of these meetings, defendant told Younge that McIntosh had paid him additional money. Defendant also told Younge that he had shot FITC's windows in an attempt to collect payment.

Younge later suggested that defendant hire a lawyer and make a demand for payment on FITC in the name of Devereaux Capital. In September 1984, defendant hired an attorney, telling him that FITC owed $11,000 to Devereaux Capital for investment and consulting services provided to FITC; defendant did not disclose to the attorney anything concerning Ewing's death. The attorney testified that he wrote a letter to FITC demanding payment of $11,000. When FITC did not pay, the attorney filed suit against FITC in Devereaux Capital's name.

After the lawsuit was filed, McIntosh instructed one of FITC's officers to purchase two cashier's checks totaling $11,000. The officer used cash to purchase the checks under an assumed name from separate banks with which FITC did not do business. In October 1984, the checks were delivered to defendant's attorney, who had defendant and Younge endorse them and disbursed $10,000 to defendant, retaining $1,000 as his fee.

When a newspaper reported that someone named "Drex" was arrested in 1984 for Ewing's murder, defendant told Younge that police had arrested the wrong person.

Sometime in 1985, defendant, calling himself "George," contacted Ewing's former girlfriend. He sought her assistance in locating Anthony, claiming that his family had lost a large sum of money in FITC investments. He also told her that he knew about Ewing's death, that it had taken place at a grassy area near the beach, and that she should help him find Anthony because Anthony had killed Ewing. He warned her that people who did not cooperate with him and his family got their faces bashed into sidewalks.

On June 23, 1987, defendant was arrested for Ewing's murder. Younge tape-recorded four telephone conversations he had with defendant while defendant was in custody (June 25, 1987; twice on June 30, 1987; and July 11, 1987); portions of these conversations were played for the jury. The prosecution also presented portions of four tape-recorded statements defendant made to San Mateo County authorities (June 24, 1987; June 25, 1987;

July 7, 1987; and September 8, 1987).[1] In these statements, defendant denied killing Ewing.

Talbert Gregory, an acquaintance whom defendant and Younge had met while incarcerated at FCI, testified that defendant had told him that he had killed a Black man at a beach and had to shoot him twice because the victim "wouldn't go down."

In rebuttal to defendant's testimony on his own behalf denying any intent to participate in a conspiracy to murder Ewing, the prosecution introduced evidence of an unrelated 1971 murder conspiracy in which defendant had participated and to which he had pleaded guilty.

The Federal Bureau of Investigation agent who served as Younge's contact also testified. He stated that Younge had testified in at least nine trials and that he had never known Younge to lie. Younge first mentioned Ewing's killing to him in late 1986.

## II. Guilt Phase—Defense Case

Defendant testified on his own behalf. He did not deny that he had manifested agreement to murdering Ewing or that he was present when Ewing was killed. Rather, defendant contended that his agreement to the conspiracy to murder Ewing was feigned, that he never intended Ewing's death, and that it was Anthony, not defendant, who shot Ewing.

Defendant's account of the existence and timing of the meetings between defendant, Younge, Anthony, and McIntosh generally corresponded to Younge's account. There were significant differences, however, in defendant's account of the content of those meetings. According to defendant, Younge proposed to Anthony and McIntosh that FITC use Devereaux Capital to transfer its money out of the country so that it would be beyond the reach of disgruntled investors once FITC's investment scheme collapsed, and that FITC pay Devereaux Capital a 20 percent commission for providing this service. Anthony and McIntosh rejected this proposal, and at their next meeting solicited defendant and Younge to provide them with a gun and silencer to murder Ewing. Younge instead suggested that he and defendant arrange for an east coast hit man to kill Ewing.

After defendant and Younge had left the meeting, Younge proposed to defendant that they pretend to agree to the murder plot, stringing Anthony

---

[1] In cross-examining defendant, the prosecution also used portions of an additional statement defendant made to the authorities on July 21, 1987, discussed below.

and McIntosh along in hopes of closing a deal to transfer millions of dollars for FITC to foreign banks, with defendant and Younge taking a percentage of the total as their fee. Once the deal was concluded, defendant and Younge would then back out of the murder plot.

According to defendant, he and Younge next met with Anthony and McIntosh at a Sausalito restaurant. At the meeting, Anthony and defendant went outside while McIntosh and Younge talked business. After the meeting, Younge told defendant that McIntosh had wanted to "firm up" a contract for murdering both Ewing and Anthony for $250,000, with a $60,000 down payment.

Like Younge, defendant testified that there were two meetings at Strawberry Mac's at which Anthony and McIntosh were to show Ewing to defendant and Younge and that Ewing only appeared the second time. According to defendant, McIntosh thereafter made two $15,000 payments to defendant, and defendant paid $3,000 from each payment to Younge.

Defendant testified that approximately one week before Ewing's murder, Anthony contacted defendant and asked him to obtain an ounce of cocaine. On May 3, 1984, defendant and Chandler traveled to Oakland and obtained the cocaine; defendant tried to contact Anthony at FITC the next day, a Friday, to deliver the cocaine but was unsuccessful. After the weekend, on May 7, defendant again called FITC to contact Anthony and make arrangements for delivering the cocaine; Anthony told defendant he would call back later with delivery instructions. Defendant intended to use Chandler to assist in the delivery, so he asked her to rent a car from Thrifty Rent-a-Car in Oakland and to meet him in San Francisco. Anthony called about 11:00 p.m. and told defendant to meet him at Denny's in Pacifica at 1:00 or 1:30 a.m.; Anthony did not mention anything about Ewing coming as well. After Chandler and defendant met in San Francisco, they drove in separate cars to Denny's; defendant placed a .22-caliber automatic pistol with a silencer in the rental car Chandler was driving.

When they arrived at Denny's, Chandler remained in the rental car while defendant went inside, had a cup of coffee and took a telephone call from Anthony. Anthony said he would be late, so defendant and Chandler went for a drive in defendant's car, returning to Denny's at 3:00 a.m. Inside, defendant found Anthony and Ewing. Anthony asked for the cocaine and defendant went outside and brought it into the bathroom of Denny's, where Anthony and Ewing began snorting it. Defendant felt this was risky and suggested that they drive down the road to the first turnout to complete the transaction. Defendant and Chandler left in the rental car and Anthony and

Ewing followed in Anthony's Corvette. Defendant and Chandler pulled into a turnout, as did Anthony and Ewing.

Defendant got out of the car and walked around to the driver's side, holding the cocaine; he also tucked his pistol into his waistband at the back. Anthony and Ewing came over to his car; defendant handed the cocaine to Anthony but Anthony, instead of giving defendant money in return, put a revolver in defendant's hands. Anthony then began inhaling cocaine. When defendant asked what the gun was for, Anthony looked up "wild-eyed," said "What do you mean, what's it for[?]," grabbed the gun, and shot Ewing, reaching around defendant to do so. Ewing asked defendant why defendant had shot him and ran away; Anthony kept shooting at Ewing until his gun was empty and then dropped it. Chandler started to drive off; defendant stopped her, picked up Anthony's gun, and got into the car with her. They drove around for several hours; at one point they stopped and defendant threw both his gun and Anthony's into the ocean.

Defendant thereafter left the state, traveling first to Seattle and then to Philadelphia, and returned to San Francisco about a week later. Younge then told him that Ewing's killing put them in a better position in dealing with FITC and that they could use it as leverage to persuade FITC to use Devereaux Capital to move money abroad. Defendant and Younge met with McIntosh two more times, receiving $10,000 on each occasion; the total payments by McIntosh then amounted to $50,000. According to defendant, it was Younge who suggested that defendant sue FITC to obtain further payment; defendant determined $11,000 as the amount to demand by adding the $1,000 that he had never been paid for the cocaine he supplied on the night of Ewing's murder to the $10,000 unpaid balance of the original $60,000 down payment. Later, defendant also contacted Anthony and obtained an additional $20,000 from him.

Defendant testified that he had previously been convicted of assault with a deadly weapon with intent to kill, burglary, automobile theft, five counts of possession of narcotics, escape from prison, and selling a gun silencer.

III. *Penalty Phase Evidence*

At the penalty phase, the prosecution presented further evidence of the 1971 murder conspiracy to which defendant had pleaded guilty and evidence that defendant had shot five times an acquaintance who refused to participate in the conspiracy. The prosecution also presented evidence of silencers, silencer materials, and weapons (including sawed-off rifles) discovered in a 1971 search of defendant's home. The parties stipulated that between 1963

and 1980 defendant was convicted of assault with a deadly weapon with intent to kill, conspiracy to commit murder, burglary, automobile larceny, five counts of possession of narcotics, escape from prison, as well as manufacture, possession, and transfer of a silencer.

Defendant presented the testimony of his wife, whom he had met at FCI. She stated that defendant supported her financially and emotionally when she was released from prison and was attending college. She loved him and attributed her success in her career to him. A contractor who had employed defendant as a plumber testified that he was a good worker. A correctional officer from a Pennsylvania prison where defendant was incarcerated in the 1970's described defendant as a model inmate who had protected an injured inmate during a prison brawl. Defendant's federal parole officer testified that defendant had been an exemplary inmate at FCI and a cooperative parolee.

DISCUSSION

I. *The Prosecution's Impeachment Use of Defendant's July 21, 1987, Statement*

After his arrest, defendant, accompanied by his attorney, spoke to the prosecutor and the police about Ewing's murder. This meeting occurred on July 21, 1987. The meeting was tape-recorded, and it began with the following exchange:

DEFENSE COUNSEL: "There is, I think, an agreement between the District Attorney's Office and the defense that this conversation will not involve a Mirandi [sic] statement by Mr. Quartermain, my client, nor will this conversation be used in court. And that the tape recording is for the protection of both parties involved and will be made available to both parties."

PROSECUTOR: "All of that's correct."

DEFENDANT: "QUESTION."

DEFENSE COUNSEL: "Yes."

DEFENDANT: "Will this, is that in court or across the board or is that just about me, against me?"

DEFENSE COUNSEL: "That's in, that's in, in, well, I think we all understand that materials that come from, uh, this meeting may be used against other parties. Um, that's certainly clear."

DEFENDANT: "It is now."

DEFENSE COUNSEL: "Okay. None of this material will be used against [*sic*] in either municipal court or in any superior court proceedings relating to this offense. Is that correct?"

PROSECUTOR: "Yes."

Defendant then proceeded to give an account of Ewing's death and the events surrounding it.

At trial, defendant testified concerning these same events. The account he gave in his trial testimony varied in numerous respects from the account he had given in his July 21, 1987, statement.

After the direct examination of defendant concluded, the prosecution moved the trial court for permission to use defendant's July 21, 1987, statement in cross-examining him. The prosecution argued that it was entitled to do so under *People* v. *May* (1988) 44 Cal.3d 309 [243 Cal.Rptr. 369, 748 P.2d 307], and *Harris* v. *New York* (1971) 401 U.S. 222 [91 S.Ct. 643, 28 L.Ed.2d 1], which permit voluntary statements taken in violation of *Miranda* v. *Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974] to be used for purposes of impeachment. Defendant objected vigorously, contending that his agreement with the prosecution prohibited such use. The trial court, relying on *May* and *Harris*, granted the prosecution's motion.

In cross-examining defendant, the prosecution used defendant's July 21, 1987, statement to impeach extensively his trial testimony. ■ On appeal, defendant contends the prosecution's use of his July 21, 1987, statement breached his agreement with the prosecution limiting the statement's use and that this breach denied him the fundamental fairness embodied in the due process guarantee of the 14th Amendment to the United States Constitution.

At the threshold lies the question of whether the prosecution's use of the statements breached the agreement. There is no doubt that it did. As set forth above, the prosecutor expressly agreed that "None of this material will be used against [*sic*] in either municipal court or in any superior court proceedings relating to this offense." This blanket prohibition was not subject to any qualification that would permit use of the statement for impeachment or for any other purpose. Moreover, contrary to the People's argument, the parties

did not condition the prohibition on the truthfulness of defendant's statement. Nor is there any basis on which to imply these qualifications into the agreement.

Whether the violation of the agreement was also a constitutional violation as defendant contends is a distinct question that requires further analysis. In arguing that the prosecution's breach of the agreement violated the due process guarantee of fundamental fairness, defendant relies on *Santobello* v. *New York* (1971) 404 U.S. 257 [92 S.Ct. 495, 30 L.Ed.2d 427]. In *Santobello*, the defendant reached a plea bargain whereby he pleaded guilty in exchange for the prosecutor's withholding any recommendation as to sentence. At the sentencing hearing, a different prosecutor appeared and argued that the defendant should receive the maximum sentence; the court sentenced defendant to the maximum sentence. The United States Supreme Court vacated the defendant's conviction because of this breach of the plea agreement. It explained its decision in these terms: "This phase of the process of criminal justice, and the adjudicative element inherent in accepting a plea of guilty, must be attended by safeguards to insure the defendant what is reasonably due in the circumstances. Those circumstances will vary, but a constant factor is that when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." (*Id.* at p. 262 [92 S.Ct. at p. 499].) Defendant contends that due process requires that the prosecution's promise here similarly be enforced.

The United States Supreme Court's subsequent decision in *Mabry* v. *Johnson* (1984) 467 U.S. 504 [104 S.Ct. 2543, 81 L.Ed.2d 437] reaffirmed the due process obligation of the prosecution to honor agreements made with and relied upon by the defendant. In *Mabry*, the prosecutor made a plea offer to the defendant's lawyer, who thereafter communicated it to the defendant. The defendant agreed to accept it, but when his lawyer communicated his acceptance to the prosecutor, the prosecutor withdrew the offer. The defendant ultimately accepted a new, less favorable offer from the prosecutor and pleaded guilty. He contended nonetheless that due process entitled him to specific performance of the prosecutor's first offer.

Although the high court in *Mabry* v. *Johnson, supra,* 467 U.S. 504, rejected the defendant's claim, it reaffirmed the principle that when a prosecutor makes a promise that induces a defendant to waive a constitutional protection and act to his or her detriment in reliance on that promise, the promise must be enforced. (*Id.* at pp. 509-510 [104 S.Ct. at pp. 2547-2548].) The court noted that it had vacated the conviction in *Santobello* v. *New York, supra,* 404 U.S. 257, because the prosecution's broken promise in

that case had induced the defendant's plea, and it quoted the *Santobello* court's statement that " '[W]hen a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled.' " (*Mabry* v. *Johnson, supra,* 467 U.S. at p. 509 [104 S.Ct. at p. 2547].) The defendant in *Mabry*, by contrast, pleaded guilty after the prosecutor had withdrawn his initial offer, so the defendant had not relied on the initial offer in pleading guilty: "[The defendant's] plea was in no sense induced by the prosecutor's withdrawn offer; unlike Santobello, who pleaded guilty thinking he had bargained for a specific prosecutorial sentencing recommendation which was not ultimately made, at the time [the defendant] pleaded guilty he knew the prosecution would recommend a 21-year consecutive sentence. . . . [The defendant's] plea was thus in no sense the product of governmental deception; it rested on no 'unfulfilled promise' . . . . [¶] . . . [¶] . . . [The defendant] was fully aware of the likely consequences when he pleaded guilty; it is not unfair to expect him to live with those consequences now." (*Id.* at pp. 510-511 [104 S.Ct. at p. 2548].)

There is another line of due process jurisprudence that bears on the issue before us as well. In a series of cases beginning with *Doyle* v. *Ohio* (1976) 426 U.S. 610 [96 S.Ct. 2240, 49 L.Ed.2d 91], the United States Supreme Court has held that it is fundamentally unfair and a denial of due process to introduce at trial evidence of a defendant's silence following advisement pursuant to *Miranda* v. *Arizona, supra,* 384 U.S. 436, of his or her right to remain silent. The high court explained this holding as follows: "[W]hile it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." (*Doyle* v. *Ohio, supra,* at p. 618 [96 S.Ct. at p. 2244].) The high court has continued to characterize the *Doyle* rule as resting on the fundamental unfairness presented by a breach of the implicit promise that the prosecution will not use at trial a defendant's silence: "The point of the *Doyle* holding is that it is fundamentally unfair to promise an arrested person that his silence will not be used against him and thereafter to breach that promise by using the silence to impeach his trial testimony." (*Wainwright* v. *Greenfield* (1986) 474 U.S. 284, 292 [106 S.Ct. 634, 639, 88 L.Ed.2d 623]; accord, *Brecht* v. *Abrahamson* (1993) 507 U.S. 619, 629 [113 S.Ct. 1710, 1717, 123 L.Ed.2d 353] ["*Doyle* was not simply a further extension of the *Miranda* prophylactic rule. Rather, as we have discussed, it is rooted in fundamental fairness and due process concerns."]; *Fletcher* v. *Weir* (1982) 455 U.S. 603, 606 [102 S.Ct. 1309, 1311, 71 L.Ed.2d 490] ["we have consistently explained *Doyle*

as a case where the government had induced silence by implicitly assuring the defendant that his silence would not be used against him"]; *Anderson* v. *Charles* (1980) 447 U.S. 404, 407-408 [100 S.Ct. 2180, 2181-2182, 65 L.Ed.2d 222].)

In light of the foregoing decisions of the high court, we conclude that it was fundamentally unfair and a violation of due process for the prosecutor in this case to use at trial defendant's July 21, 1987, statement in breach of the prosecutor's promise not to do so. Just as the defendant in *Santobello* v. *New York, supra*, 404 U.S. 257, waived his constitutional rights and pleaded guilty in exchange for and in reliance upon the prosecutor's promises in the plea agreement, defendant here waived his constitutional right to remain silent in exchange for and in reliance upon the prosecutor's promise not to use in court anything defendant said. Because the prosecutor's promise induced defendant's waiver of his constitutional right to remain silent, due process required that the prosecution honor the promise. As is true of a guilty plea, when a defendant's waiver of the right to remain silent "rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." (*Santobello* v. *New York, supra*, 404 U.S. at p. 262 [92 S.Ct. at p. 499].)

*Mabry* v. *Johnson, supra*, 467 U.S. 504, also supports this conclusion. Unlike the defendant in *Mabry*, defendant here did act to his detriment in reliance on the prosecutor's promise by waiving his right to remain silent and making a statement: To use the words of the *Mabry* court, defendant's statement was "induced by the prosecutor's . . . offer"; defendant made his statement "thinking he had bargained for a specific prosecutorial [promise] . . . which was not ultimately [performed]"; defendant's statement did rest on an " 'unfulfilled promise' "; defendant was not "fully aware of the likely consequences" when he made his statement; and it is "unfair to expect him to live with those consequences now." (*Id.* at pp. 510-511 [104 S.Ct. at p. 2548].)

Analysis under the *Doyle* v. *Ohio, supra*, 426 U.S. 610, line of cases leads to the same conclusion. Defendant received an *explicit* promise that his statement would not be put to any use at trial; the prosecution breached that promise by using defendant's statement to impeach his trial testimony. Just as the defendant's silence in *Doyle* was induced by the implicit promise that his silence would not be used at trial, defendant's July 21, 1987, statement was induced by the prosecutor's promise that it would not be used at trial. Just as it violates due process to use at trial a defendant's silence in breach of the implicit promise in the *Miranda* warnings not to do so, it violates due

process here to use at trial defendant's statement in violation of the explicit promise not to do so. By the prosecution's use of his statement contrary to the agreement, defendant was made an unwilling witness against himself.[2]

■ Given our conclusion that defendant was denied his federal constitutional right to due process by the prosecution's use of the July 21, 1987, statement, we must decide whether the error was harmless. We conclude that under the circumstances of this case the proper test is whether the error was harmless beyond a reasonable doubt—that is, whether it is clear beyond a reasonable doubt that use of the statement did not contribute to the verdict. (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 828, 17 L.Ed.2d 705, 24 A.L.R.3d 1065].) Under this test, the appropriate inquiry is "not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." (*Sullivan* v. *Louisiana* (1993) 508 U.S. 275, 279 [113 S.Ct. 2078, 2081, 124 L.Ed.2d 182], italics original.) For the reasons that follow, we conclude that the error was not harmless with respect to any portion of the guilt phase verdict.

The only direct evidence that defendant killed or conspired to kill Ewing consisted of prosecution witness David Younge's testimony that defendant had agreed with McIntosh and Anthony to kill Ewing and that defendant later admitted to Younge that he had killed Ewing. The rest of the evidence linking defendant to the murder plot was circumstantial. This evidence largely concerned events whose occurrence was undisputed: for example, defendant's meetings with McIntosh, Anthony, and Younge; defendant's meeting with Ewing and Anthony at Denny's on the night of the murder; defendant's presence at the murder scene, and the postmurder payments to defendant by McIntosh. Defendant presented an exculpatory version of how those events came to occur; Younge presented an incriminating version of the same events. The jury's assessment of defendant's credibility thus was crucial to his defense.

The prosecution sought to undermine defendant's credibility, and its use of defendant's July 21, 1987, statement was a significant part of its impeachment of defendant. Although both defendant's July 21, 1987, statement and his trial testimony were exculpatory, the prosecution demonstrated in its

---

[2]We note that the trial court's reliance on *Harris* v. *New York, supra,* 401 U.S. 222, in reaching a contrary conclusion was misplaced. At issue in *Harris* was whether the scope of *Miranda*'s prophylactic, judicially created exclusionary rule should be extended to prohibit the impeachment use as well as the direct use of voluntary but un*Mirandized* statements. *Harris* did not address the issue here of whether it violates due process for the prosecution to secure a defendant's waiver of the right to remain silent by promising not to use the defendant's statement in court and then to breach that agreement by using the statement at trial.

cross-examination of defendant that the two statements diverged on numerous points, raising doubts as to whether either statement was truthful. The prosecution's cross-examination established that defendant's July 21, 1987, statement and his trial testimony differed in these respects: whether defendant went to Strawberry Mac's at various times to meet with Younge, Anthony, and McIntosh, and to observe Ewing; whether Anthony called defendant at a bar or a residence to ask him to obtain cocaine and whether Anthony told defendant how much cocaine he wanted; whether Younge and defendant called Anthony together to tell him they had obtained the cocaine; whether defendant had delivered the cocaine the same day that he had obtained it or had instead held it in his garage for several days; whether on the night of the killing he and Chandler had met at a bar or a residence; whether defendant told Chandler for whom the cocaine was intended; whether defendant intended to introduce Chandler to Anthony; whether Chandler entered the restaurant where defendant met with Anthony, McIntosh, and Ewing; whether defendant brought a gun with him when he delivered the cocaine; whether Anthony's headlights remained on during the entire time defendant was at the beach where Ewing was killed; whether defendant disposed of Anthony's gun after the killing; whether defendant told Younge what occurred during the killing; whether the price for the killing was to be $60,000 or $250,000; whether McIntosh wanted both Anthony and Ewing killed; whether defendant had given Younge any of the $20,000 he received from McIntosh after Ewing's killing; whether defendant received any money from Anthony after Ewing's killing; and whether Younge had authorized defendant to sue FITC in the name of Younge's company, Devereaux Capital.

The prosecution's use of defendant's July 21, 1987, statement was not limited to defendant's cross-examination. A major theme of the prosecution's guilt phase closing argument to the jury was that defendant was a chronic liar whose testimony was completely untrustworthy. ("If you find that someone lies over and over again, then I think that we can all assume that he's just lying all the time, and why is he lying? Because he's guilty of murder.") In support of this theme the prosecution repeatedly argued to the jury the contradictions between defendant's trial testimony and his July 21, 1987, statement.

In extensively cross-examining defendant concerning the July 21, 1987, statement and in focusing in closing argument on the contradictions between defendant's statement and his trial testimony, the prosecution sought to paint defendant as a fabulist. In doing so, it struck at the heart of his defense. Under the circumstances, it is not possible to conclude that the guilt phase verdict "was surely unattributable to the error." (*Sullivan* v. *Louisiana, supra,*

508 U.S. at p. 279 [113 S.Ct. at p. 2081].) Accordingly, we reverse the entire judgment, including defendant's convictions for murder and conspiracy to murder, the findings on the special circumstance and personal-firearm-use allegations, and the sentence of death.

For the guidance of the trial court, we also address the following issues that are likely to arise upon retrial.

II.   *Guilt Phase Issues*

   A.   *Trial Court Limitations on the Defense's Cross-examination of David Younge*

■■ ■■      Defendant contends that the trial court erred in refusing to permit him to cross-examine prosecution witness David Younge regarding whether, in criminal proceedings unrelated to defendant's case, Younge had bribed judges. Defendant made a motion *in limine* seeking permission to conduct such cross-examination; the prosecutor opposed it on the grounds that acts of bribery were not evidence of a witness's character for veracity and that the probative value of the bribery evidence was outweighed by the time it would consume (see Evid. Code, § 352). The trial court excluded the evidence of Younge's acts of judicial bribery on both of these grounds.

Defendant argues that excluding the evidence of Younge's briberies violated his right under the state and federal Constitutions to confront witnesses against him (see U.S. Const. 6th & 14th Amends.; Cal. Const., art. I, § 15) and was an abuse of the trial court's discretion under Evidence Code section 352 to exclude evidence "if its probative value is substantially outweighed by the probability that its admission will . . . necessitate undue consumption of time." (*Ibid.*) In response, the People acknowledge that judicial bribery reflects on a witness's veracity but maintain that the exclusion of evidence here did not violate defendant's confrontation rights and was not an abuse of discretion.

■      Although the right of confrontation includes the right to cross-examine adverse witnesses on matters reflecting on their credibility, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination." (*Delaware* v. *Van Arsdall* (1986) 475 U.S. 673, 679 [106 S.Ct. 1431, 1435, 89 L.Ed.2d 674].) In particular, notwithstanding the confrontation clause, a trial court may restrict cross-examination of an adverse witness on the grounds stated in Evidence Code section 352. (See *People* v. *Harris* (1989) 47 Cal.3d 1047, 1090-1091 [255 Cal.Rptr. 352, 767 P.2d 619].) A trial court's limitation on

cross-examination pertaining to the credibility of a witness does not violate the confrontation clause unless a reasonable jury might have received a significantly different impression of the witness's credibility had the excluded cross-examination been permitted. (*Delaware* v. *Van Arsdall, supra,* 475 U.S. at p. 680 [106 S.Ct. at pp. 1435-1436]; *People* v. *Belmontes* (1988) 45 Cal.3d 744, 781 [248 Cal.Rptr. 126, 755 P.2d 310].)

■ In this case, Younge's credibility was extensively impeached. Younge admitted on cross-examination that he had previously perjured himself "many times" while testifying in other judicial proceedings, that he had bribed others to commit perjury, and that he had coached yet another witness in a different proceeding to give perjured testimony. Younge also admitted that he had been convicted of "a hundred and thirty something" counts of mail fraud as well as sale of cocaine and conspiracy to manufacture and distribute methamphetamine. Younge described in detail his extensive involvement in the drug trade; he claimed to have earned over $20 million in that business and said that the federal government allowed him to keep several million dollars as part of his plea bargain. Because of the impeachment evidence that was presented, a reasonable jury would not have received a significantly different impression of Younge's credibility had he additionally been cross-examined regarding his bribery of two judges in other proceedings. Thus, there was no confrontation clause violation. (*Delaware* v. *Van Arsdall, supra,* 475 U.S. at p. 680 [106 S.Ct. at pp. 1435-1436]; *People* v. *Belmontes, supra,* 45 Cal.3d at p. 781.)

■ Defendant also contends that the trial court abused its discretion under Evidence Code section 352 by excluding cross-examination of Younge concerning these judicial briberies on the ground that it would consume an undue amount of time. We conclude that the trial court lacked an adequate basis for excluding the bribery cross-examination on this ground. Younge had previously freely admitted under oath in other judicial proceedings to his two acts of judicial bribery, even stating that he was "not ashamed to admit it." Thus, it was unlikely that Younge would have denied the briberies under cross-examination in this case; had he done so, defendant could have introduced Younge's prior testimony admitting the briberies under the hearsay exception for prior inconsistent statements. (Evid. Code, § 1235.) Neither course would have consumed a significant amount of time.

B.  *Exclusion of Evidence Regarding International Gold Trade*

■ Younge testified on cross-examination that he initially became interested in working with FITC because he thought that FITC needed to make gold purchases and he could assist it to purchase gold bullion from international sources at a substantial discount off the market price. Younge asserted

that he could purchase gold at discounts of 40 or 50 percent from such sources as gold mines in Ghana and individuals who had fled their native countries with ill-gotten hoards of gold. Younge testified he never told McIntosh or Anthony of his plan to buy gold for FITC.

During the defense case, defendant sought to present as a witness an expert in the gold bullion trade to demonstrate the falsity of Younge's statements that gold was available at a discount in the international market. The prosecutor objected that the evidence was irrelevant, was directed to a collateral matter, and its presentation would consume an undue amount of time. The trial court agreed and excluded the evidence under Evidence Code section 352.

Defendant contends that the trial court erred. Defendant argues that proving that gold was not available internationally for discount sale would have shown that Younge approached McIntosh and Anthony not for any legitimate business purpose but to engage in an illegal money-laundering scheme in which Younge would launder the profits of FITC for them. In turn, defendant argues, this would have supported his defense that his agreement to murder Ewing was just a pretense designed to further Younge's money-laundering scheme by ingratiating defendant and Younge with Anthony and McIntosh; he contends it would also have shown that Younge was motivated to incriminate defendant in order to conceal Younge's money-laundering scheme.

The trial court did not abuse its discretion in excluding defendant's evidence relating to the international gold market. Such evidence was collateral to the issues at trial. Whether Younge lied in stating his belief that gold was available internationally at a discount also was collateral; impeaching him on this point would not have significantly altered the jury's perception of his credibility in general, in light of the other impeachment evidence described in part II.A., *ante*, and in light of the fact that defendant's expert testimony would not have impeached Younge directly but only inferentially (because the expert would not have testified to whether Younge knew that gold was unavailable at a discount).

Nor would showing that gold was unavailable at a discount have significantly enhanced defendant's argument that his agreement to kill Ewing was a sham intended by Younge to gain favor with Anthony and McIntosh. It is a weak chain of inferences that leads from the excluded evidence of the unavailability of gold at a discount to the inference that Younge was aware of this unavailability to the inference that Younge's true aim was to launder money for FITC. There is no support, however, for the ultimate inference—

that it is more probable that Younge would feign agreement in the murder conspiracy if his goal were to launder money than if his goal were to buy gold. Defendant offers no explanation why, if Younge intended to obtain FITC's business by the pretense of appearing to further Anthony and McIntosh's plan to murder Ewing, Younge would not have had an equal motivation to do so whether the business he intended to conduct was a legitimate gold-buying operation or a money-laundering scheme. Furthermore, since Younge did not actually launder any money for FITC, he did not have a strong motive to incriminate defendant to conceal such a scheme. Accordingly, the trial court did not abuse its discretion in excluding defendant's expert evidence on the operation of the international gold market. For these same reasons, the exclusion of this evidence did not deny defendant due process under the Fourteenth Amendment to the United States Constitution by rendering his trial fundamentally unfair, did not violate the Eighth Amendment to the United States Constitution by rendering his trial unreliable, and did not violate his right of confrontation under either the state or federal Constitutions.

### C. *Admission of Defendant's Prior Conviction for Conspiracy to Commit Murder*

At trial, defendant admitted agreeing with Anthony and McIntosh to participate in killing Ewing but said that his agreement was a sham intended to persuade Anthony and McIntosh to use the services of defendant and Younge to launder money for FITC. The trial court, after a hearing, then permitted the prosecution to rebut this testimony by introducing evidence detailing defendant's participation and conviction in an unrelated 1971 murder-for-hire conspiracy to show that defendant's intent to conspire to kill Ewing and his intent to kill Ewing were real and not feigned. Defendant contends that in admitting this evidence the trial court abused its discretion and violated his right to due process.

The evidence was properly admitted. Defendant put in issue the sincerity of his admitted agreement to the conspiracy to kill Ewing. Evidence that defendant had in the past conspired to kill someone else was relevant to show that defendant's agreement to the conspiracy to kill was genuine and not feigned. It was therefore admissible under Evidence Code section 1101, subdivision (b), which permits the introduction of evidence of other crimes "to prove some fact . . . other than [the defendant's] disposition to commit such an act" (*ibid.*), for its purpose was not to show that defendant was likely to engage in murder conspiracies but rather to show that, if he was otherwise proven to be a member of a murder conspiracy, it was likely that his intent was genuine. (See *People* v. *Rowland* (1992) 4 Cal.4th 238, 261 [14

Cal.Rptr.2d 377, 841 P.2d 897] [" ' "if a person acts similarly in similar situations, he probably harbors the same intent in each instance" ' "].) It was also relevant to show defendant's intent to kill Ewing, for that too was in issue. (See *id.* at pp. 260-261.)

Nor did the trial court abuse its discretion in concluding that the probative value of this evidence was not significantly outweighed by its potential for undue prejudice and in deciding not to exclude the evidence under Evidence Code section 352. The trial court guarded against any improper use of the evidence by admonishing the jury before the evidence was received that it could only be used to prove defendant's intent, and not to show his propensity to commit the charged crimes. In addition, the court later gave the jury a limiting instruction to the same effect. Nor was the evidence inflammatory or otherwise of a such a nature that the jury would have had unusual difficulty in limiting its use to the question of intent.

Moreover, from defendant's own testimony the jury already knew of defendant's significant criminal record, including a plea of guilty and conviction of assault with intent to kill. This was not a case where, in the absence of the challenged evidence of other crimes, defendant would have appeared to the jury to have led a blameless life.

Finally, admission of the evidence did not render the trial fundamentally unfair in violation of due process. There is no reason to believe that, as defendant contends, the jury failed to maintain the presumption of innocence once it learned of defendant's participation in the 1971 murder conspiracy. The conspiracy evidence, while adverse to defendant, was not of such overwhelming force that it would have caused a reasonable juror to abandon the trial court's instructions and presume defendant's guilt. The conspiracy was distant in time, unrelated in its circumstances to the crimes for which defendant was being tried, and its intended victim was not killed; although the conspiracy had probative value as to defendant's intent in this case, it would not have blinded jurors to the weight of the other evidence in the case.

### D. *Admission at Guilt Phase of Defendant's Use of Racial Epithets*

■ During his police interviews, defendant on three occasions used racial epithets to refer to the murder victim, Ewing, who was Black, or to other Blacks. When the trial court ruled these interviews admissible, defendant moved to have the epithets excluded from any evidence presented concerning the interviews. The court denied the motion, and the epithets were presented to the jury as part of the evidence concerning the statements made by defendant during the interviews. Defendant contends that the

epithets should have been excluded under Evidence Code section 210 as irrelevant and, even if relevant, should have been excluded under Evidence Code section 352 and the due process clause of the federal Constitution because their probative value was substantially outweighed by the danger of undue prejudice. Defendant also contends that admission of the epithets caused the jury to punish him for his speech in violation of the First Amendment of the federal Constitution.

The trial court did not abuse its discretion in refusing to exclude defendant's racial epithets. Contrary to defendant's conclusion, his use of the epithets was not irrelevant. (See Evid. Code, § 210.) Defendant used them to describe the victim specifically in two instances and to describe members of the victim's race generally in the third instance. As defendant puts it in his brief, these statements showed that he "despised [Ewing] and mocked [Ewing] for the color of his skin." Expressions of racial animus by a defendant towards the victim and the victim's race, like any other expression of enmity by an accused murderer towards the victim, is relevant evidence in a murder or murder conspiracy case. Among other things, it is evidence of the defendant's prior attitude toward the victim, a relevant factor in deciding whether the murder was deliberate and premeditated because it goes to the defendant's motive. (See *People* v. *Hawkins* (1995) 10 Cal.4th 920, 956 [42 Cal.Rptr.2d 636, 897 P.2d 574]; *People* v. *Nicolaus* (1991) 54 Cal.3d 551, 577-578 [286 Cal.Rptr. 628, 817 P.2d 893] [defendant's antireligious and anti-Christian statements properly admitted in prosecution for murder of his Christian wife].)

In addition, the racial epithets were not so inflammatory that their probative value was substantially outweighed by their potential for undue prejudice. (Evid. Code, § 352.) The unfortunate reality is that odious, racist language continues to be used by some persons at all levels of our society. While offensive, the use of such language by a defendant is regrettably not so unusual as to inevitably bias the jury against the defendant. Here, the racial epithets were only a small portion of the evidence concerning defendant's interviews with the police, and the prosecutor did not ask any follow-up questions or otherwise focus attention on them. The prosecutor did not argue that defendant should be convicted because he was a racist. The prosecutor made only a passing reference in the guilt phase closing argument to the epithets, not as evidence of defendant's racism but as evidence of defendant's duplicitous nature by contrasting the insult of the epithets with defendant's solicitous reference in his trial testimony to the "unfortunate demise" of Ewing. Accordingly, there is no reason to believe that the jury here reacted to defendant's racial epithets by convicting him for what he called Ewing, rather than for what he did to Ewing. For the same reason, the

admission of the epithets was not so prejudicial that it denied defendant a fair trial in violation of his right to due process.

Furthermore, the admission of the racial epithets did not violate defendant's right under the First Amendment of the federal Constitution not to be punished for his speech. Defendant relies on *Dawson* v. *Delaware* (1992) 503 U.S. 159 [112 S.Ct. 1093, 117 L.Ed.2d 309], a capital case in which the United States Supreme Court held that the introduction at the penalty phase of evidence of the defendant's membership in a White racist prison gang, the Aryan Brotherhood, violated the defendant's First Amendment rights. In *Dawson*, however, the evidence had no relevance because both the victim and the defendant were White, and there was no possible racial motivation for the killing. (*Id.* at p. 166 [112 S.Ct. at p. 1098].) Nor did the evidence have any other relevance, for it presented only the defendant's "abstract beliefs" and did not attempt to link those beliefs to any factor relevant to sentencing, such as the defendant's future dangerousness. (*Ibid.*)

The *Dawson* court, however, was careful to note that "the Constitution does not erect a *per se* barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and associations are protected by the First Amendment." (*Dawson* v. *Delaware*, *supra*, 503 U.S. at p. 165 [112 S.Ct. at p. 1097].) The high court concluded that such evidence is admissible if relevant to some issue that is being tried, noting that it had previously approved the use of "evidence of racial intolerance . . . where such evidence was relevant to the issues involved." (*Id.* at p. 164 [112 S.Ct. at p. 1097], citing *Barclay* v. *Florida* (1983) 463 U.S. 939 [103 S.Ct. 3418, 77 L.Ed.2d 1134].) Here, as explained previously, the evidence was relevant to the issues being tried, and thus its use did not violate the First Amendment.

III. *Penalty Phase Issues*

A. *Consideration at Penalty Phase of Defendant's Use of Racial Epithets*

■ At the penalty phase of defendant's capital trial, the trial court gave the jury a standard instruction telling it that it could consider the evidence presented at the guilt phase as well as that introduced at the penalty phase. (See CALJIC No. 8.85 (5th ed. 1988).) Defendant argues the instruction was erroneous because it permitted the jury to consider at the penalty phase the three instances of his use of racial epithets discussed in part II.D., *ante*. According to defendant, the jury's consideration of the racial epithets at the penalty phase biased the jurors against him and caused them to use the

epithets as evidence in aggravation, thereby violating three separate provisions of the federal Constitution. He contends that his death sentence violated the prohibition against cruel and unusual punishment of the Eighth Amendment to the United States Constitution, as well as depriving him of his Fourteenth Amendment right to due process, because the epithets biased the jury and were used by the jury as a nonstatutory aggravating factor. He also contends that admission of the epithets caused the jury, in violation of the First Amendment to the federal Constitution, to punish him for exercising his right of free speech.

Defendant failed to preserve these arguments for appeal, for he requested that the trial court instruct the jury it could consider the guilt phase evidence and did not seek a limiting instruction directing the jury not to consider the racial epithets at the penalty phase. (See *People* v. *Cooper* (1991) 53 Cal.3d 771, 827 [281 Cal.Rptr. 90, 809 P.2d 865].)

In any event, defendant's claims lack merit. The jury was not given free rein to use the guilt phase evidence without restriction as a factor in aggravation supporting death as the penalty. It also received other instructions informing it that all the evidence presented, whether at the guilt phase or the penalty phase, must be evaluated according to the statutory list of aggravating and mitigating factors set out in Penal Code section 190.3. These factors do not permit racial bias to be considered as an aggravating factor; they do, however, permit the jury to consider the circumstances of the crime (Pen. Code, § 190.3, factor (a)). For the reasons set forth in part II.D., *ante*, the evidence was relevant to one of the circumstances of the crime, defendant's motivation, and thus was properly presented to the jury. (See *People* v. *McPeters* (1992) 2 Cal.4th 1148, 1189 [9 Cal.Rptr.2d 834, 832 P.2d 146].)

Nor is there any reason to believe that the jury's death penalty verdict reflected any bias against defendant for his use of racial epithets or an erroneous belief that a defendant's racial prejudice in the abstract could be considered as an aggravating factor. The racial epithets were not called to the jury's attention in the penalty phase. There was no reference in the penalty phase testimony or in the prosecution's penalty phase argument to defendant's use of racial epithets.[3] Thus, there is no merit to defendant's contention that admission of the epithets at the penalty phase violated his rights under the Eighth and Fourteenth Amendments.

---

[3]Defendant contends that the prosecutor indirectly referred to defendant's racial epithets by stating in the penalty phase closing argument that defendant showed callousness when defendant referred ironically in his trial testimony to the "unfortunate demise" of Ewing. This interpretation of the prosecutor's statement is farfetched, however, and not one that a reasonable juror would make. What made defendant's reference ironic was the fact that he

Nor did the admission of the epithets at the penalty phase violate defendant's First Amendment rights. As explained in part II.D., *ante*, the United States Supreme Court has held that evidence concerning one's beliefs, including evidence of racial intolerance, is admissible at the penalty phase if it is relevant. (*Dawson* v. *Delaware, supra*, 503 U.S. at p. 165 [112 S.Ct. at pp. 1097-1098]; *Barclay* v. *Florida, supra*, 463 U.S. at p. 949 [103 S.Ct. at p. 3424] ["The United States Constitution does not prohibit a trial judge from taking into account the elements of racial hatred in this murder."].)

B. *Admission at Penalty Phase of Defendant's Possession of Weapons and Silencer*

In 1971, police in Pennsylvania searched defendant's home and found firearms (including several sawed-off rifles), silencers, and material and instructions for making silencers. At the penalty phase in this case, the trial court admitted evidence of defendant's possession of these items under factor (b) of Penal Code section 190.3 as evidence of "criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." (*Ibid.*) Defendant objected unsuccessfully to the admission of this evidence, contending that possession of the firearms and silencer materials did not carry with it "an implied threat to use force or violence."[4] (Pen. Code, § 190.3, factor (b).)

Admission of the evidence was proper. We reject defendant's contention that in the absence of any accompanying assaultive conduct the illegal possession of a firearm does not carry an implied threat to use force or violence. In *People* v. *Garceau, supra*, 6 Cal.4th 140, 203, we concluded that the defendant's illegal possession of an arsenal including a machine gun, silencers, and handguns "clearly involved" an implied threat to use force or violence. Strengthening that conclusion, we noted, was the defendant's possession of a silencer found next to the machine gun. (*Id.* at pp. 203-204.) Although defendant contends that our conclusion in *Garceau* was dictum because in that case we had earlier concluded that the defendant had failed to preserve the issue, he presents no persuasive reason to question that conclusion in this case. Possession of sawed-off firearms and silencer materials carries an implied threat of violence because their obvious purpose is to harm humans. (See *ibid.*) Defendant does not suggest that the sawed-off firearms and silencer materials he possessed in 1971 were intended for any legitimate, nonviolent use.

---

caused Ewing's "unfortunate demise," not the fact that he had used a racial epithet to refer to Ewing.

[4]In his reply brief, defendant also contends that there was insufficient evidence that his possession of the sawed-off guns and the silencer materials was criminal. Defendant did not make this objection below and thus has not preserved it for our review. (*People* v. *Garceau* (1993) 6 Cal.4th 140, 203 [24 Cal.Rptr.2d 664, 862 P.2d 664].)

C. *Exclusion of Evidence Regarding Alternative Sentence of Life Without Parole*

Defendant sought to admit the testimony of an expert on prisons regarding the prison conditions he would experience if he were sentenced to life without parole instead of receiving the death penalty. The trial court excluded this evidence as irrelevant. Defendant challenges this ruling. Defendant presents five arguments in support of his claim, four of which are constitutionally based and one of which is statutory: (1) his right to due process under the Fourteenth Amendment to the federal Constitution entitled him to present this evidence because other evidence presented at trial depicted life in federal penal institutions as pleasant and comfortable; (2) his right to due process and the prohibition against cruel and unusual punishment of the Eighth Amendment to the federal Constitution entitled him to present this evidence to rebut the prosecution's argument of future dangerousness in custody; (3) the evidence was relevant and admissible mitigating evidence under the Eighth Amendment as interpreted in *Skipper* v. *South Carolina* (1986) 476 U.S. 1 [106 S.Ct. 1669, 90 L.Ed.2d 1]; (4) his right to due process entitled him to introduce this evidence so that the jury would understand the nature of the sentencing alternatives available to it; (5) the evidence was admissible under Penal Code section 190.3.

We have previously held that evidence of the conditions of confinement that a defendant will experience if sentenced to life imprisonment without parole is irrelevant to the jury's penalty determination because it does not relate to the defendant's character, culpability, or the circumstances of the offense. (*People* v. *Daniels* (1991) 52 Cal.3d 815, 876-878 [277 Cal.Rptr. 122, 802 P.2d 906]; *People* v. *Thompson* (1988) 45 Cal.3d 86, 138-139 [246 Cal.Rptr. 245, 753 P.2d 37].) Its admission is not required either by the federal Constitution or by Penal Code section 190.3. (*People* v. *Daniels*, *supra*, 52 Cal.3d at pp. 876-878; *People* v. *Thompson*, *supra*, 45 Cal.3d at pp. 138-139.) This disposes of defendant's third, fourth, and fifth arguments.

Defendant maintains that, notwithstanding this authority to the contrary, the evidence was relevant in this case because the jury received evidence mentioning the conditions at FCI, the federal prison where defendant, defendant's wife, Younge, McIntosh, Anthony, and witness Talbert Gregory had been incarcerated, and conditions at a Pennsylvania prison where defendant had been incarcerated in the 1970's. Witnesses testified that FCI was a co-ed facility where prisoners of opposite sexes mingled, formed relationships (defendant, for example, met his wife there), and picnicked together on the grounds, and where prisoners were paid to participate in vocational training, played cards and backgammon, and could wander at will between each

other's rooms. Defendant contends that this evidence left the jury with the false impression that if he were sentenced to life imprisonment in the California penal system he would serve his sentence under similarly comfortable conditions, and that he was entitled to rebut this misimpression.

Defendant relies on *People* v. *Mason* (1991) 52 Cal.3d 909, 960-961 [277 Cal.Rptr. 166, 802 P.2d 950], a case in which the defendant had presented evidence suggesting that he could be confined under close supervision in a secured housing unit in prison and that he was not dangerous when confined under such conditions. At the penalty phase, the prosecution offered evidence that, in the absence of continuing misbehavior, the defendant would not be confined in a secured housing unit for more than one year. We concluded: "In view of the evidence about defendant's confinement, the trial court could reasonably have concluded that the jury had been left with a misleading impression about the conditions under which defendant would be held if sentenced to life without possibility of parole. Because the defense had elicited some of this evidence and had exploited it in an attempt to show that defendant was not dangerous, [the prosecution's evidence that the defendant would not be confined in a secured housing unit for more than one year] was *arguably* proper rebuttal." (*Id.* at p. 961, italics added.) We also held that admission of the evidence was harmless.

In this case, we question whether defendant's excluded evidence would have been even arguably proper as rebuttal. Unlike *People* v. *Mason, supra,* 52 Cal.3d 909, here the prosecution did not deliberately elicit and exploit the evidence concerning the conditions at FCI and the Pennsylvania prison. The evidence defendant complains of was presented at the guilt phase, and no reference was made to it during the penalty phase. That evidence came in in passing during the course of other testimony, and the prosecution made no effort to focus the jury's attention on it, either during the presentation of evidence or during argument in the penalty phase. Nor did the prosecution otherwise suggest that defendant would be incarcerated under conditions similar to those at FCI or the Pennsylvania prison if he were sentenced to life without parole. There is nothing to support defendant's contention that the jury surmised that if defendant were sentenced to life without parole he would be incarcerated under conditions similar to those he had experienced previously in other prison systems while serving lesser sentences for lesser crimes. Accordingly, the presentation of the evidence regarding the conditions at FCI and the Pennsylvania prison did not trigger a due process right to present evidence regarding the conditions under which defendant would be incarcerated if sentenced to life without parole.

In addition, the prosecutor's argument regarding defendant's potential for violence in prison did not give rise to a constitutional right to introduce

evidence of conditions of confinement. The prosecutor's argument came in a discussion of mitigating evidence introduced by defendant under factor (k) of Penal Code section 190.3. Its purpose was to rebut the defense argument that, based on the records of defendant's previous incarcerations, he would behave well in prison if sentenced to life without parole; it was not an argument that defendant should be executed because he would be violent in prison. The prosecutor's argument on the point was brief: "However, one thing to think about, he has always done well in prison except in Florida for one very simple reason, I suspect, because he knew that he would soon get out. And he knew how to get along because he would soon get out. As he did. [¶] This time, if he's given life without possibility of parole, he'll not get out and that is substantially different. Will then the real face of Drax Quartermain come to the fore again in prison? Will we have that conscious-less [sic] man always ready to resort to violence to get his way, to make his way, no longer need to curry favor with any authorities in prison. Will we see again that sneaky killer who shoots when his victims are helpless? [¶] What I have just said concerning the records from Pennsylvania and the comments they are on—and also from Florida, has only to do with factor K, only to do with factor K. [¶] And what I am attempting to show is that the attempt by the defense to present mitigating evidence really is not very mitigating whatsoever when you consider the entirety of Mr. Quartermain."

The prosecutor's argument properly focused on defendant's character and record. (See *People v. Daniels, supra*, 52 Cal.3d at p. 878.) The prosecutor argued that defendant's past record of good behavior might not hold true if he were sentenced to life without parole, not that the prison system would be incapable of restraining or controlling any violence by defendant. The proper rebuttal to this argument was other evidence and argument directed to defendant's character and record, not evidence concerning the conditions of confinement if he were sentenced to life without parole.

CONCLUSION

The judgment, including the sentence of death, is reversed.

George, C. J., Mosk, J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.

On September 17, 1997, the opinion was modified to read as printed above.