Filed 6/27/14  P. v. Sotelo CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JOSE ANDRES CONTRERAS SOTELO,<br><br>    Defendant and Appellant. | G048011<br><br>(Super. Ct. No. 11CF0804)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, James Edward Rogan, Judge.  Affirmed.

Janice R. Mazur, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Christopher P. Beesley and Peter Quon, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

Appellant was convicted of committing a lewd act on a child 10 years his junior. Although the victim was impeached at trial with evidence of his own criminal conduct, appellant contends reversal is required because the trial court did not allow him to elicit all of the details surrounding the victim's criminal history. We do not believe the presentation of additional impeachment evidence would have materially affected the jury's impression of the victim's credibility or led to a more favorable verdict for appellant, so we affirm the judgment.

FACTS

In March 2011, J.L. was 15 years old. The youngest of eight children, he lived with his family in Santa Ana and attended school there. Appellant, then age 38, was a friend of J.L.'s family. He rented a room at their house and often brought them snacks from the restaurant where he worked. Appellant also gave J.L. personal items, such as clothing and perfume. They spent time together in J.L.'s room listening to music and hanging out, and appellant even cut J.L.'s hair sometimes. Appellant claimed he did these things because he liked J.L. and considered him to be like a little brother. But J.L.'s sister Martha thought it was odd J.L. spent so much time in appellant's room and suspected something fishy was going on between them.

At trial, J.L. testified that until the time this case arose, he had a good relationship with appellant and trusted him. However, when he was in appellant's room on March 8, 2011, appellant started hugging him and wouldn't let go. Appellant also pulled J.L.'s pants down and said he wanted to have sex with him. However, J.L. made it clear he wasn't interested, so appellant let him go.

About a week later, J.L. was at home because he had been suspended from school. Appellant lured J.L. into his room by telling him he had the money for an iPod J.L. had recently sold him. However, instead of giving J.L. the money, appellant hugged him and pushed him onto his bed. Then he got on top of J.L. and started kissing him. J.L. told appellant to stop and tried to get away, but appellant was too big and strong.

2

Although appellant was mad at J.L. for not submitting to his advances, he eventually let him go.

The third and final incident occurred on March 24, 2011. According to J.L., he went to appellant's room to ask him about the iPod money. While he was standing at the doorway, appellant pulled him into the room and shut the door. Then he pulled down J.L.'s pants and pushed him onto his bed. J.L. tried to get away, but using his body to restrain J.L., appellant grabbed J.L.'s penis and started stroking it. Appellant told him he would give him money to have sex with him, but J.L. wasn't interested. He struggled to get away from appellant and abruptly left the room. However, he did not tell anyone about appellant's conduct because he was too embarrassed to do so.

Within a day or two after this final incident, J.L. stole some Mexican money from appellant's bedroom, because appellant still hadn't paid him for the iPod. When appellant confronted J.L. about the Mexican money, he admitted taking it. However, despite appellant's repeated demands, he refused to give it back to him. Therefore, on March 27, 2011, appellant called the police and two officers came to the house to investigate.

When questioned about the Mexican money, J.L. denied taking it. In his mind, he thought the only reason appellant called the police is because he was mad at him for rebuffing his sexual advances. Nevertheless, in his initial conversation with the police, J.L. did not mention the advances. However, when the police spoke to J.L.'s sister Martha, she told them she thought there was something sexual going on between J.L. and appellant. At that point, the investigation shifted toward appellant, and both he and J.L. were taken to the police station for questioning.

At the station, J.L. was reluctant to discuss the alleged molestation. He alluded to appellant engaging in appropriate behavior but did not provide any details about it. He did admit having appellant's Mexican money. However, he claimed appellant planted it in his room in order to get him in trouble, which was not true.

3

Following J.L.'s interview, the police questioned appellant. They told him they knew from J.L. and J.L.'s family that he had molested J.L., but appellant denied any wrongdoing during the first part of the interview. He said J.L. was a juvenile delinquent who did drugs, had stolen from him in the past, and was frequently in trouble with the law and in school. He also said J.L. would often come on to him and expose himself to him while they were in his bedroom. Appellant claimed he did his best to refrain from touching J.L., even when J.L. took his (appellant's) hand and put it on his (J.L.'s) penis. Appellant told the police that the first two times this happened, he pulled his hand away. But on the third occasion, appellant did not pull away; instead, he stroked J.L.'s penis for about 10-15 seconds. Appellant admitted he and J.L. were both aroused by this. He also said that, even though J.L. initiated the contact, he felt bad for what he did because he knew it was wrong.

In the wake of appellant's admissions, the police interviewed J.L. again. When they told him about appellant's statements, he was much more forthcoming about the molestation and described it in greater detail, including the time appellant stroked his penis. J.L. also admitted taking appellant's Mexican money and putting it in his closet.

At trial, appellant invoked his right not to testify. His attorney claimed that appellant's confession was unreliable and that J.L. fabricated the sexual allegations in order to deflect blame for stealing appellant's Mexican money. Indeed, the defense characterized J.L. as a deeply troubled teenager who had a history of criminal conduct and would say anything to avoid getting in further trouble with the law. Considerable evidence was presented to support this theory.

First, J.L. admitted on the stand that, in exchange for his testimony, the prosecution had granted him immunity from prosecution for any charges stemming from his theft of appellant's Mexican money.

4

Second, J.L. admitted that when this case arose he was on juvenile probation for committing vandalism. He knew that if he broke the law, he would be in violation of probation and he wouldn't get the vandalism case dismissed.

Third, J.L. admitted he was currently facing new criminal charges. In alluding to those charges in closing argument, defense counsel stated J.L. had a felony and a misdemeanor charge presently pending against him. Although J.L. testified he hadn't been offered any promises regarding those charges, defense counsel argued J.L. knew "what side his bread [was] buttered on" and was savvy enough to understand it would be in his best interests to keep the district attorney's office happy by testifying against appellant in this case.

Fourth, during his testimony, J.L. was impeached with various statements he made to the police during his interviews. Not only was his testimony inconsistent in many ways with what he told the police, he claimed he had no recollection of the alleged molestation until the prosecution refreshed his memory with the police reports. Even J.L.'s sister admitted he was not a very truthful person.

Based on the three incidents J.L. testified about, appellant was charged with three counts of lewd conduct on a child 10 years his junior. (Pen. Code, § 288, subd. (c).) The jury found appellant not guilty as to the first two incidents and guilty as to the third. Although appellant was sentenced to two years in prison, he was released after the verdict because his presentence custody credits exceeded the length of that term.

DISCUSSION

The sole issue on appeal is whether the trial court allowed the defense sufficient leeway in impeaching J.L. Appellant contends the trial court prejudicially erred by failing to allow him to elicit the details surrounding J.L.'s pending charges. Particularly, appellant asserts he should have been permitted to present evidence regarding the factual basis for the charges and to explore the issue of J.L.'s gang status. But this is an area over which the trial judge has broad discretion, and we do not believe

5

the presentation of additional impeachment evidence would have affected the jury's assessment of J.L.'s credibility or its ultimate verdict in the case. Thus, there is no cause for reversal.

The impeachment issue was litigated extensively before trial. In addition to discussing the fact J.L. was on juvenile probation when the present case arose and would be testifying under a grant of immunity, the parties also debated the extent to which J.L.'s pending criminal charges should be admitted. The nature of those charges was documented in a police report that the prosecutor disclosed to the court and defense counsel and that has been transmitted to us for purposes of appellate review.

The police report reveals that on June 22, 2012 — roughly six months before appellant's trial began — J.L. was spotted by the police in an area of Santa Ana where "'gangsters/cholos'" are known to sell drugs. When the police approached the area, J.L. ran into traffic and was nearly hit by a car. Ordered to stop, he fled into the backyard of a nearby residence. He was in the process of throwing his cell phone, $46 in cash and two plastic baggies under a car when the police finally caught up with him. J.L. initially ignored the officers' commands to get on the ground. But when he realized there was nowhere to run, he gave himself up. Subsequent testing revealed the baggies he discarded each contained .3 grams of methamphetamine. It was the arresting officer's opinion that J.L. possessed the methamphetamine for purposes of sale. The officer also noted in his report that J.L. had the words "One Love" tattooed on his chest. Under the section of his report entitled "moniker/nickname," the officer typed in, "'One love,' 'Outlaw' Delhi Street Gang."

When the trial court asked the prosecutor about the status of this pending case, she said it was just recently filed. She also informed the court that, despite the arresting officer's opinion, appellant was not charged with possession for sale. Instead, he was charged with "straight" felony possession. (Health & Saf. Code, § 11377, subd. (a).) In addition, he was charged with the misdemeanor offense of resisting, delaying or

6

obstructing a peace officer in the performance of his or her duties. (Pen. Code, § 148, subd. (a).)

Defense counsel argued the charged crimes involved acts of moral turpitude that evidenced J.L.'s dishonest character. As part of his effort to impeach J.L., defense counsel wanted to elicit the facts underlying the charged offenses. However, the trial court believed the circumstances surrounding the charges had less of a bearing on J.L.'s credibility than the simple fact that he would be testifying with criminal charges hanging over his head. Concerned about J.L.'s privilege against self-incrimination and the undue consumption of time, the court ruled it was not going to allow defense counsel "to get into the particular facts of [J.L.'s] pending case."

In making this ruling, the trial court noted J.L. had only been arrested on the charges, not convicted of them. It did not believe the information in the arrest report was sufficiently reliable to be used against J.L. for impeachment purposes. Nor did it believe there was enough information in the report to conclude the pending charges were gang related. Therefore, it precluded defense counsel from getting into that aspect of the report, as well.

However, the court also recognized the pending charges were relevant to show J.L. had a "potential motive to curry favor with the prosecuting agency, the agency that is relying upon him as their star witness in this particular case." It thus ruled that defense counsel could bring up the charges to impeach J.L. in that regard. The court felt its ruling struck a balance between the competing interests and was consistent with Evidence Code section 352, which requires consideration of both the probative value and prejudicial effect of proffered evidence prior to its admission into evidence.[1]

---

[1]     Evidence Code section 352 gives judges the discretion to exclude evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

7

That is not how appellant sees it. He argues the court was unduly concerned with the fact J.L. had not been convicted of the charged offenses because conduct involving moral turpitude may be admitted for impeachment purposes, regardless of whether it resulted in a criminal conviction. (*People v. Wheeler* (1992) 4 Cal.4th 284, 295-296.) And even though J.L. was only charged with simple possession, which is not a crime of moral turpitude, appellant asserts the underlying facts of the police report were relevant to show J.L. dealt drugs, resisted arrest and was involved in a gang, which reflect a "'general readiness to do evil.'" (*People v. Castro* (1985) 38 Cal.3d 301, 315.) In appellant's opinion, the jury just could not get a fair and accurate picture of J.L.'s corrupt and dishonest character without knowing all of the details surrounding the charges he was facing at the time of trial.

We cannot agree. One of the purposes of Evidence Code section 352 is to "prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues." (*People v. Wheeler, supra*, 4 Cal.4th 284, 296.) The statute gives trial judges considerable discretion to bar evidence that is offered for impeachment purposes. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9.) On appeal, we will not disturb an order excluding impeachment evidence unless the trial court acted "in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. [Citation.]" (*Id.* at pp. 9-10.)

Similarly, "'trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . cross-examination.' [Citation.]" (*People v. Quartermain* (1997) 16 Cal.4th 600, 623.) Unless the defendant can show his proposed cross-examination would have produced a significantly different impression of the witness's credibility, the trial court's rejection thereof will not be deemed to have violated the defendant's rights. (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 680; *People v. Pearson* (2013) 56 Cal.4th 393, 455-456.)

8

In this case, the jury was exposed to plethora of facts which negatively reflected on J.L.'s credibility. Not only was it shown that J.L. lied to the police and lied at trial about what he told the police, he claimed he couldn't even recall the alleged molestation until the prosecutor refreshed his memory with his prior statements. In addition, the jury heard evidence that J.L. 1) stole from appellant, 2) was testifying under a grant of immunity, 3) was on probation when the present case arose, 4) used drugs, 5) had been suspended from school, 6) was known to stretch the truth, and 7) was sexually promiscuous.

On top of all that, the trial court allowed evidence J.L. had charges pending against him at the time of trial. Even though the court did not permit the facts pertaining to those charges to come in, defense counsel informed the jury during closing argument the charges involved a felony and a misdemeanor, so the general seriousness of the charges was no secret. More importantly, irrespective of their underlying facts, the charges, *in and of themselves*, provided J.L. with a motive to implicate appellant in order to gain favor with the prosecution. Defense counsel skillfully argued this point in closing argument, and he brought up every other conceivable fact and circumstance at his disposal to attack J.L.'s credibility. As a matter of fact, he assailed J.L.'s honesty and integrity so extensively that by the end of his argument, he apologized to the jury for "beating that . . . horse" to death.

Appellant argues that if the jurors had known J.L. was a drug dealer who resisted arrest and was involved in gangs, they would have been disinclined to believe his claim that appellant was able to overpower and sexually abuse him. However, if J.L. had been asked about the information in the police report and denied it was true or invoked his privilege against self-incrimination, it would have taken considerable time and effort for the defense to establish the truth of that information by alternative means. We agree with the Attorney General that this could have effectively resulted in a "trial within a trial."

9

Moreover, the information in the police report didn't establish J.L. was a hardcore gang member. Rather, the report depicted J.L. as a small time street dealer who ran from the police to avoid getting in trouble. In light of this, and because it is undisputed J.L. was younger and smaller than appellant at the time the alleged molestation occurred, we do not believe the facts surrounding J.L.'s pending charges would have put his allegations in a different light. Even if those facts had been fully revealed, they would not have materially undermined J.L.'s claim that appellant was able to sexually victimize him.

At bottom, we are convinced the jury knew by virtue of the avalanche of impeachment evidence against J.L. that he was no angel. We do not believe eliciting the facts surrounding the charges pending against him at the time of trial would have produced a significantly different impression of his credibility. Nor do we believe the exclusion of those facts was arbitrary, capricious or resulted in a manifest miscarriage of justice. As such, there is no basis for disturbing the judgment. Appellant has failed to show he was denied his right to a fair trial or prejudiced by the court's challenged ruling.

## DISPOSITION

The judgment is affirmed.

BEDSWORTH, ACTING P. J.

WE CONCUR:

MOORE, J.

FYBEL, J.

10