Filed 10/10/23  P. v. Ramirez CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>EDWARD WILLS RAMIREZ,<br><br>    Defendant and Appellant. | G061655<br><br>(Super. Ct. No. 21NF1716)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Michael A. Leversen, Judge.  Affirmed.

Jennifer A. Gambale, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Melissa A. Mandel and Joseph C. Anagnos, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Edward Wills Ramirez of domestic battery, two counts of dissuading a witness, false imprisonment, and other offenses, and the trial court sentenced him to 20 years in prison. On appeal, Ramirez claims the court erred by admitting evidence that he had threatened to "kill people" and used a racial epithet toward the victim. He also challenges his sentence, claiming the court impermissibly imposed two punishments for an indivisible course of conduct. Finding no error, we affirm.

## FACTS

### I. *The Information*

An information charged Ramirez with the following offenses against his fiancée, F.B.: domestic battery (Pen. Code, § 273.5, subd. (a); count 1),[1] two counts of dissuading a witness by force or threat (§ 136.1, subd. (c)(1); counts 2 & 4); false imprisonment by violence, etc. (§§ 236 & 237, subd. (a); count 3), and two drug-related offenses not pertinent to this appeal. The information alleged Ramirez committed the offenses in counts 1 and 2 "on or about" March 2, 2021, and the offenses in counts 3 and 4 "on or about" March 24, 2021. The information also included various enhancement allegations and alleged that Ramirez had suffered two prior strikes and two prior serious felonies.

### II. *The Evidence at Trial*

### A. *The People's Case*

### 1. *The March 2, 2021, Incident (Counts 1 & 2)*

Ramirez and F.B. lived together in the same apartment complex in which F.B.'s adult sons, Jared S. and Dustin S., also resided. F.B. also had a minor daughter, and she and Ramirez had a son and a grandson together. Around February 2021, Ramirez started using drugs again, and F.B. suspected he was also selling drugs. She

---

[1] Undesignated statutory references are to the Penal Code.

was adamant about not having drugs in their home because she did not want to jeopardize her visitation rights with their grandson and her custody rights over her daughter.

On March 2, 2021, F.B. and Ramirez were arguing about his drug use, and F.B. told Ramirez she was going to leave him. At a certain point during the argument, Ramirez grabbed F.B. by the throat, slammed her onto their bed, and told her, "[Y]ou're not fucking leaving me." He later hugged F.B., sat her up, and said he did not want to hurt her and was "just trying to shut [her] up." As the two sat on the edge of the bed together, F.B. again raised the subject of drugs in the home. Ramirez became angry and slammed his hands down toward the mattress. Blood started pouring down F.B.'s leg, and she then saw a knife on the floor next to the bed. When F.B. said that Ramirez had hurt her, he initially denied doing so but later said: "'I didn't mean to do that. I just was pissed[,] and I just put my hand down. . . . [B]ut leave me? You're not going to fucking leave me."

F.B. was unable to stand up, and as she was losing blood, she began slurring her speech. She told Ramirez she thought she was dying and tried to get her cellphone to call 911, but he grabbed her phone and threw it across the room, accusing F.B. of trying to send him back to prison. Ramirez threatened both F.B. and her children.

At some point, Dustin returned home from work, and Ramirez told him that something had happened and asked him to come to his and F.B.'s apartment. When Dustin saw F.B., he asked her what had happened, and she claimed she had slipped on spilled water and landed on a knife. Dustin called 911, despite Ramirez's requests that he not call because it would look bad for Ramirez. F.B. was taken to the hospital, where she received 16 stitches. She did not report Ramirez's actions to the police because she was afraid of him.

2. *The March 24, 2021, Incident (Counts 3 & 4)*

On March 24, 2021, around 8:00 p.m., F.B. again confronted Ramirez about his drug use after she found drugs in the apartment. She said she wanted to leave

3

him. Ramirez responded by grabbing F.B. by the throat, slamming her onto their bed, and holding her down. He told her: "'[Y]ou're not going to leave me. . . . [T]he only way you're going to leave me is dead. . . . If I have to hurt your kids, . . . I'll fucking start with Dustin. I'll do Jared.'"

Ramirez wrapped his arms around F.B. and continued to hold her on the bed. When she asked if she could go to the living room, Ramirez said no. He told her that he was not going to let her leave that evening and that she "wasn't going to go to [her] son's apartment and tell on [him] or try to get them to kick him out." Ramirez said F.B. was going to sit right next to him, and if she tried to leave, he was "just gonna kill [her], it'll be his third strike[,] and [they]'re all dead."

Terrified, F.B. lay on the bed with Ramirez until he fell into a deep sleep. She then moved his arms off her, got off the bed, and entered the living room to wake her sleeping daughter. Around 1:00 a.m. on March 25, F.B. and her daughter left her apartment and went to Jared's apartment. There, F.B. told Jared what had happened that night, as well as on March 2. She then called the police.

In her 911 call, F.B. briefly recounted the events of that night and the March 2 incident.[2] She later gave more detailed accounts of both incidents to a responding police officer in Jared's apartment, and the conversation was recorded on the officer's bodycam.[3] F.B. told the officer about the threats Ramirez had made that night. Among other things, she recounted: "[H]e was just telling me what he's gonna do to [my kids] [unintelligible]. If he goes to prison[,] he's gonna be a third strike and [unintelligible] kill people. He doesn't care." At trial, F.B. testified that "[Ramirez] said he's not going to do life for just one person." Police arrested Ramirez and found him in possession of drugs.

---

[2]     A recording of the 911 call was played for the jury at trial.

[3]     These portions of the bodycam footage were also played for the jury.

3. *The Jail Call*

On August 30, 2021, Ramirez called F.B. from jail and, among other things, claimed she had cut herself during the March 2 incident. F.B. rejected his claim and detailed what he did and said during that incident. She said Ramirez even called her "a fuckin nigger." Ramirez repeatedly denied doing so but later said: "If I did, I was fucked, I don't remem[ber], look if I did I'm sorry, dude. . . . I'm sorry if I did all that baby."[4]

B. *The Defense's Case*

At trial, Ramirez presented evidence that F.B. had suspected he was cheating on her and that after the March 24 incident, her suspicions were confirmed when she was able to look through his phone. The evidence included recordings of jail calls between Ramirez and F.B., as well as text messages between F.B. and another woman. The evidence showed that F.B. was angry about Ramirez's infidelity and, among other things, that she believed the only way to keep him from being with other women was to "keep [him] stored away."

III. *The Verdict and the Sentence*

Following trial, the jury found Ramirez guilty as charged and found the enhancement allegations to be true. In a bifurcated proceeding, the trial court found Ramirez had previously been convicted of two offenses that qualified as both strikes and serious felonies. At sentencing, the court exercised its discretion to strike Ramirez's prior strikes and sentenced him to a total of 20 years in prison, which included separate

---

[4] A recording of this jail call was played at trial.

5

sentences for counts 3 (false imprisonment) and 4 (dissuading a witness), both committed during the March 24 incident.[5] Ramirez timely appealed.

DISCUSSION

Ramirez challenges both his convictions for counts 1 through 4, asserting evidentiary errors, and his sentence, asserting he should not have received separate sentences for his offenses during the March 24 incident. As discussed below, we find no error and therefore affirm.

I. *Evidentiary Challenges*

Ramirez claims the trial court erred by admitting F.B.'s statements that he had (1) threatened to kill people if he was to be arrested for a third strike, and (2) used a racial epithet toward F.B. He claims both statements were irrelevant and unduly prejudicial. As discussed below, we find no abuse of discretion in the trial court's admission of these statements.

A. *Governing Principles*

Irrelevant evidence is inadmissible. (Evid. Code, § 350.) Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) "'The test of relevance is whether the evidence tends "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive.'" (*People v. Harris* (2005) 37 Cal.4th 310, 337.)

---

[5] The parties did not discuss, and the trial court did not expressly address, whether section 654 permitted separate sentences for these counts. As discussed below, this provision prohibits multiple punishments for offenses committed through either a single act or a course of conduct pursued with a single objective. (*People v. Corpening* (2016) 2 Cal.5th 307, 311.) However, it does not preclude separate punishments for offenses committed in a shared course of conduct if perpetrated in pursuit of independent objectives. (*In re Raymundo M.* (2020) 52 Cal.App.5th 78, 94 (*Raymundo M.*).)

6

Under Evidence Code section 352, a trial court has discretion to exclude relevant evidence if its probative value is substantially outweighed by the probability that its admission will, among other things, create substantial danger of undue prejudice. (*Ibid*.) "Prejudice for purposes of Evidence Code section 352 means evidence that tends to evoke an emotional bias against the defendant with very little effect on issues . . . ." (*People v. Crew* (2003) 31 Cal.4th 822, 842.) "'In other words, evidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction.'" (*People v. Branch* (2001) 91 Cal.App.4th 274, 286.)

We review a trial court's evidentiary rulings for abuse of discretion. (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266.) "Specifically, we will not disturb the trial court's ruling 'except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.'" (*Ibid.*) A miscarriage of justice results only if "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

B. *Ramirez's Threat that He Would Kill People*

1. *Background*

Before trial, the prosecution notified the trial court they intended to introduce F.B.'s statement to the responding police officer that Ramirez had threatened to "kill people" if he was to go to prison because it would be his third strike. In a pretrial motion, Ramirez countered that this statement was irrelevant and unduly prejudicial because, according to him, section 136.1, subdivision (c)(1), required proof of a threat to

7

harm a specific person, rather than unspecified "'people.'" Following a hearing on the parties' pretrial motions, the court ruled the evidence relevant and admissible.[6]

2. *Analysis*

The trial court did not abuse its discretion in admitting F.B.'s statement that Ramirez had threatened to "kill people" if he was to go to prison. As noted, in describing the March 24 incident to the responding officer, F.B. recounted Ramirez's threat after he slammed her onto the bed: "[H]e was just telling me what he's gonna do to [my kids] [unintelligible]. If he goes to prison[,] he's gonna be a third strike and [unintelligible] kill people. He doesn't care." To prove that Ramirez committed felony dissuading of a witness under section 136.1, subdivision (c)(1), the prosecution was required to show he had committed an act "accompanied by force or by an express or implied threat of force or violence, upon a witness or victim or any third person." (§ 136.1, subd. (c)(1).) Evidence of Ramirez's threat to "kill people" if he was to be arrested for a third strike was relevant to establish this element.[7]

Ramirez contends this statement was nevertheless irrelevant, asserting it was at least equally likely that, rather than relating a threat he had made, F.B. was expressing her own belief about how violent and dangerous he was. We disagree.

---

[6]    The trial court later instructed the jury that comments about Ramirez's strikes and expected sentence, included in F.B.'s statement to the officer, were not offered for the truth of those matters.

[7]    In his reply brief, Ramirez claims F.B.'s statement was not relevant to establish the threat element of the offense because a threat to kill unspecified "people" was not a threat to harm "a witness or victim or any third person" under section 136.1, subdivision (c)(1). Initially, he has forfeited this contention by failing to raise it in his opening brief. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 408.) Regardless, and even assuming a threat to kill unspecified people is not a threat to harm "any third person," F.B. prefaced her account of Ramirez's statement by saying he had told her what he was going to do *to her children*. Similarly, Ramirez's other threats to kill F.B. and two of her children, noted above, suggested the threat at issue targeted the same group.

Ramirez essentially argues that the relevance of F.B.'s statement depended on the existence of a preliminary fact—that she was purporting to recount a threat he had made. (Evid. Code, § 400 ["'preliminary fact' means a fact upon the existence or nonexistence of which depends the admissibility or inadmissibility of evidence"].) When the relevance of proffered evidence depends on the existence of a preliminary fact, the proponent of the evidence need only provide "evidence sufficient to sustain a finding of the existence of the preliminary fact." (*Id.*, § 403, subd. (a).) F.B.'s statement—when viewed in context—clearly related a threat Ramirez had allegedly made to her. In describing the March 24 incident to the responding officer, F.B. said: "[*Ramirez*] *was just telling me* what he's gonna do to [my kids] [unintelligible]. If he goes to prison[,] he's gonna be a third strike and [unintelligible] kill people." (Italics added.) Along the same lines, as noted above, F.B. testified at trial that "[*Ramirez*] *said* he's not going to do life for just one person." (Italics added.) Ramirez's claim that F.B.'s statement was irrelevant because she might have merely been expressing her own belief is therefore misguided.

Ramirez's claim that this evidence was unduly prejudicial under Evidence Code section 352 rests on his contention that it was irrelevant and "simply served to paint [him] as a dangerous and violent criminal." As discussed, the evidence was relevant to prove an element of the crime under section 136.1, subdivision (c)(1). Moreover, given other evidence that Ramirez had threatened to kill more than one person and his specific threats to kill F.B. and two of her children—the admission of which Ramirez does not challenge on appeal—the admission of his threat to "kill people" could not have caused

9

any undue prejudice to his defense.[8]  Accordingly, the trial court did not abuse its discretion in admitting F.B.'s statement about Ramirez's threat.

C.  *Ramirez's Use of a Racial Epithet Toward F.B.*

1.  *Background*

During trial, the parties disagreed on the admissibility of the recorded jail call in which F.B. accused Ramirez of using the racial epithet toward her.  The defense argued the racial epithet should be redacted because it was inflammatory and because, in the call, Ramirez repeatedly denied using it before finally apologizing if he had.  The prosecution argued that redacting the offensive word would remove necessary context from the conversation.  The trial court ultimately ruled F.B.'s statement about the racial epithet admissible, stating it was no more offensive than other evidence presented to the jury and the defense could highlight the fact that, during the call, Ramirez never admitted to using the racial epithet toward F.B.

2.  *Analysis*

Ramirez argues F.B.'s statement regarding the racial epithet was inadmissible because:  (1) under Evidence Code section 1101, subdivision (a), "[e]vidence of a person's character or a trait of his or her character . . . is inadmissible when offered to prove his or her conduct on a specified occasion"; (2) the statement was irrelevant because he repeatedly denied using the racial epithet, before finally apologizing "if" he used it; and (3) the statement was unduly prejudicial.  The trial court did not abuse its discretion by admitting F.B.'s statement.

As the Attorney General notes, Ramirez's use of a racial epithet toward F.B. "demonstrated [his] belligerent and confrontational attitude, tending to show he

---

[8]  Ramirez asserts in conclusory fashion that the trial court's admission of F.B.'s statement violated his federal constitutional right to due process because it was unduly prejudicial.  Given our conclusion that the evidence was not unduly prejudicial, its admission did not violate his right to due process.

10

stabbed [her] on purpose, not by accident." This evidence was relevant regardless of whether Ramirez was generally racist and did not implicate Evidence Code section 1101. And evidence is not irrelevant merely because the defendant contradicts it.[9] (Cf. *People v. Robinson* (2005) 37 Cal.4th 592, 632 ["Evidence is not 'unduly prejudicial' under the Evidence Code . . . merely because the defendant contests that evidence and points to allegedly contrary evidence"].)

Here, too, Ramirez's claim that the evidence was unduly prejudicial under Evidence Code section 352 rests on his rejected contention that it was irrelevant. Moreover, while use of the racial epithet certainly did not commend Ramirez to the jury, this offensive language was insufficient to inflame the jury's passions against him: "The unfortunate reality is that odious, racist language continues to be used by some persons at all levels of our society. While offensive, the use of such language by a defendant is regrettably not so unusual as to inevitably bias the jury against the defendant." (*People v. Quartermain* (1997) 16 Cal.4th 600, 628.) The trial court did not abuse its discretion by admitting the challenged statement.[10]

II. *Sentencing Challenge*

Ramirez claims section 654 precluded his separate sentences for his convictions of false imprisonment under count 3 and dissuading a witness under count 4 because he committed both crimes at the same time with a single objective. As discussed below, we conclude Ramirez committed the crimes in a course of conduct with dual objectives and thus could be punished for both offenses.

---

[9] Ramirez does not contest the admission of F.B.'s statement on hearsay grounds, and we do not address the hearsay rule's application to her statement.

[10] As to this evidence, too, Ramirez asserts in conclusory fashion that its admission violated his federal constitutional right to due process because it was unduly prejudicial. Again, given our conclusion that the evidence was not unduly prejudicial, its admission did not violate his right to due process.

A. *Governing Principles*

Section 654, subdivision (a), provides: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." "The purpose of section 654 is to ensure that a defendant's punishment is commensurate with his culpability and that he is not punished more than once for what is essentially one criminal act." (*People v. Hicks* (2017) 17 Cal.App.5th 496, 514.)

"[T]he statutory reference to an 'act or omission' may include not only a discrete physical act but also a course of conduct encompassing several acts pursued with a single objective." (*People v. Corpening*, *supra*, 2 Cal.5th at p. 311.) Thus, "'[i]f all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.'" (*People v. Chung* (2015) 237 Cal.App.4th 462, 468.) "'If, on the other hand, "[the defendant] entertained multiple criminal objectives which were independent of and not merely incidental to each other, he may be punished for independent violations committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct."'" (*Raymundo M.*, *supra*, 52 Cal.App.5th at p. 94.)

"'In the absence of any reference to . . . section 654 during sentencing, the fact that the court did not stay the sentence on any count is generally deemed to reflect an implicit determination that each crime had a separate objective.'" (*Raymundo M.*, *supra*, 52 Cal.App.5th at p. 94.) "'Whether section 654 applies in a given case is a question of fact for the trial court, which is vested with broad latitude in making its determination.'" (*People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1378.) "'Its findings will not be reversed on appeal if there is any substantial evidence to support them.'" (*Ibid.*)

B. *Analysis*

Section 654 did not preclude Ramirez's separate punishments for counts 3 and 4, committed during the March 24 incident, because the record supported a finding

12

that he committed them with independent objectives. Although Ramirez maintains he committed the crimes in an indivisible course of conduct, with the single purpose of preventing F.B. from reporting him to the police, the evidence supported a finding that he had also acted with the objective to maintain power and control over her and prevent her from leaving him.

Ramirez manifested his intent to control F.B. and prevent her from leaving him during the earlier, March 2 incident. After F.B. threatened to break up with him, he violently slammed her onto the bed and told her, "You're not fucking leaving me." And after he injured F.B.'s leg, he said he had not meant to do that but then added, "'[B]ut leave me? You're not going to fucking leave me.'"

Ramirez continued to manifest the same intent during the March 24 incident. While he threatened F.B. to prevent her from reporting him to the police, he also made clear that F.B. "wasn't going to go to [her] son's apartment and . . . try to get them to kick him out." And he again told her, "[Y]ou're not going to leave me," adding, "[T]he only way you're going to leave me is dead." Because substantial evidence supported a finding that Ramirez's offenses during the March 24 incident had independent objectives, section 654 did not preclude his separate punishments for those crimes. (*Raymundo M.*, *supra*, 52 Cal.App.5th at p. 94.)

13

DISPOSITION

The judgment is affirmed.


O'LEARY, P. J.

WE CONCUR:


SANCHEZ, J.


MOTOIKE, J.

14