Filed 7/17/25  P. v. McKnight CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C101045 |
| Plaintiff and Respondent, | (Super. Ct. No. 21FE007702) |
| v. | |
| BRYAN LAMONT MCKNIGHT, | |
| Defendant and Appellant. | |

A jury found defendant Bryan Lamont McKnight guilty of being a felon in possession of a firearm, and the trial court found both of his strike priors true.  The trial court sentenced defendant to 32 months in state prison.  On appeal, defendant contends the trial court abused its discretion when it did not allow him to impeach the principal prosecution witness, L.B., by asking her whether she threatened one of the women L.B. exploited as a pimp.  Further, defendant argues the trial court erred in denying his motion under *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.  We affirm.

## I.  BACKGROUND

The information charged defendant with being a felon in possession of a firearm. (Pen. Code,[1] § 29800, subd. (a)(1).)  It also alleged defendant had two prior convictions

---

[1]     Further undesignated statutory references are to the Penal Code.

for robbery and assault with a semiautomatic firearm that qualified as strikes. (§§ 211, 245, subd. (b), 667, subds. (b)-(i), 1170.12.)

Defendant moved in limine for permission to impeach the primary prosecution witness, L.B., with evidence she was involved in pimping or pandering a woman named E.G. Defendant further sought to introduce evidence L.B. told E.G. that L.B. would tell men they could engage in rape fantasies and/or kill E.G.

During argument, the trial court found there was sufficient evidence that L.B. was engaged in pimping and pandering and that was a crime of moral turpitude. The trial court continued, "The question is, is that admissible? . . . [¶] The question is we have to balance -- it's prejudicial to [the prosecution's] case, for sure, no doubt about that. But it's also pretty probative, especially in light of what seems, in this case, like may have very well been an act of prostitution occurring on this night. There's certainly some suggestion that that is true, it's a dating app. It was the defendant's claim that he showed up with $8,000, roughly, or something like that." After further argument from counsel, the trial court expressed its tentative ruling that the probative value of the pimping allegations was not substantially outweighed by the prejudicial impact of allowing limited questions on the topic. The trial court would consider whether the other evidence should be admitted under Evidence Code section 352.

When the trial court returned to session, it confirmed defendant could inquire into L.B.'s pimping and pandering. As to whether the defense could go further, the court stated: "I'm in a different position, because under 352, I need to use my discretion to prevent undue prejudice towards a witness. There is a difference between a defendant that -- how prejudicial something can be against a defendant is a slightly different analysis than with a witness, [because] we can get too collateral. [¶] Obviously, I don't want to get into collateral issues with a witness [who] you want to impeach. She should be impeached, is my view. . . . [¶] . . . I think there's a little bit of a difference, though, if you're trying to prove the defendant's guilt, there's -- because even then, if it gets too

2

collateral, that's one thing, but when the witness is testifying, as long as you can prove credibility or moral turpitude conduct, I think the Court has to be able to draw some lines so that we don't get into really prejudicial stuff. [¶] The rape fantasy and . . . 'I'll let somebody kill you and not,' . . . [i]n the context of which that threat is made, sounds to me to be a little different. It sounds to me like it's a threat towards her to kind of get her in line a little bit, which I agree, is fairly probative, but I also think it gets a little collateral. I want her to be impeached so the jury can consider it, but I think at some point, the prejudicial impact of that kind of language is so graphic that it becomes -- it outweighs the probative value of what we're trying to do here. . . . [M]y view of that is that [it] is a road too far. Especially in the context in which it occurred. If she had said that in front of a client that she was hiring them out for that purpose, I think that would be different. The fact that she's saying it on a text . . . threatening her if she doesn't do certain things, that she is going to hire her out in that way is a different context which will require greater explanation, which would require more nuance and requires more testimony. And I think I'm going to draw the line there. And you can go into this [pimping], but you cannot specifically -- you cannot go into those comments about a rape fantasy or the hiring out for killing."

At trial, L.B. confirmed she had worked for and was involved with a pimp named Devin Hartley. On direct examination, L.B. testified Hartley facilitated her sex work and used L.B. to collect money for him. On cross-examination, L.B. claimed she considered Hartley her boyfriend. L.B. denied being a pimp and asserted she did not set up dates for other women. She further denied managing a website where men would reach out to her and Hartley to schedule dates. She did testify she would set up dates for another woman, E.G., if directed to do so by Hartley. To the extent she received money for dates E.G. participated in, she claimed it was for Hartley's benefit.

Turning to the events of the night in question, May 3, 2021, L.B. testified she met defendant online and the two agreed to "hook up." L.B. invited defendant to her

3

apartment. L.B. originally told defendant he was allowed to spend the night. This was the first time she personally met defendant and L.B. denied he was coming to pay her for sex. After defendant showed up at her apartment, the two "hung out."

L.B. testified defendant had a backpack with a gun in it that night. The first time she saw the gun, it was on the counter. She was not worried about the gun nor did it make her feel scared. L.B. did not think she touched the gun.

L.B. began to feel uncomfortable when defendant started "acting kind of weird." The first thing he did that was weird is he started cleaning all the counters and opening the cabinets.

The two had consensual sex that night, during which defendant told L.B., she was "having sex with a killer right now." That statement made her feel uncomfortable and scared. L.B. asserted the gun was tucked against the wall behind her bed while they were having sex. She did not see defendant touch the gun, but somehow it moved from the counter into the bedroom. L.B. did not see him touch the gun in the bedroom either, but she "guess[ed]" defendant was fidgeting with the gun while they were having sex.

After they had sex, L.B. was afraid of defendant and wanted him to leave, but did not tell him that, because she was afraid. Instead, she left her apartment and called the police to get him out of the apartment.

After admitting she was testifying under a grant of immunity, L.B. denied she stole $8,000 from defendant. She also denied having set up defendant to get him out of her apartment to steal his money.

Officer Kailyn Whitaker responded to a call at L.B.'s home at 4:00 a.m. The report was that there was someone in L.B.'s apartment who had a gun. Officer Whitaker met L.B. on the street. After taking L.B.'s statement, officers established a perimeter around the building.

Officer Ryan King also arrived at the apartment around 4:00 a.m. Officer King contacted defendant in the apartment by telephone and asked him to come outside.

4

Defendant responded by saying he needed to call some family and the two ended the call. Defendant left the building about 4:30 a.m. and was taken into custody.

After a search of the building, officers found a loaded .45-caliber handgun in a garbage room that was down the hall from L.B.'s apartment. When the officers came out of the building with a gun, they showed it to L.B. Her first reaction was to ask where the officers found the gun. After that, she asked if they had removed the clip from the gun.

An investigator extracted data from defendant's cellular telephone. The extraction revealed five photographs of defendant taking photographs of himself in his underwear and baseball cap while standing in front of a bed. There was a gun visible in the photograph tucked in the side of the bed behind him. The photographs show they were taken at L.B.'s home on May 3, 2021, at 2:18 a.m. The phone also had a video of L.B.'s apartment with a time stamp of 7:00 a.m. on May 3, 2021, showing an L-shaped object on the counter.

Defendant's phone also had text messages to L.B. One message said, "Bro, what are you doing?" The next one said, "Bro, if I'm going to jail, tell me so I can let my family know, at least."[2]

A forensic investigator did not find any fingerprints on the gun or ammunition. Four people contributed to DNA on the gun. Sixty four percent of the DNA came from one or two females and 27 percent came from defendant. The investigator did not obtain a reference sample for L.B. and could not identify the other contributors to the DNA besides defendant.

The defense called E.G. who testified she was named as a victim of pimping and pandering by Hartley. L.B. scheduled appointments and used Cash App to receive

---

[2] The time stamps on the messages suggest they were made after defendant was arrested. The content of messages, however, suggest they were sent during the standoff with the police. As to the video, its time stamp showed 7:30 or 7:40 a.m. on May 3, 2021. An officer testified time stamps can be incorrect.

money for E.G.'s sexual services. On cross-examination, E.G. testified Hartley was the one who recruited her, and L.B. worked for Hartley as well. E.G. believed Hartley was the one who kept all of the money generated by these activities.

Defendant testified on his own behalf. He met L.B. online and came to an agreement with her to pay her for sex. Defendant brought a bag with him containing over $8,000 cash.

When he arrived at her apartment, it was dirty and messy. They both cleaned it up. He was planning on staying there for a few days, and L.B. agreed he could stay for the weekend. The two engaged in sexual relations during the first hour after his arrival. Defendant fell asleep around 1:30 or 2:00 a.m.

A call from the police woke up defendant. He was surprised. L.B. was gone when he woke up.

Defendant denied bringing a gun to the apartment. He did not remember seeing a gun on the counter. He denied owning the gun in the background of his self-portrait. Defendant claimed he has not touched a gun since being convicted of a felony.

When he went to recover his bag after his arrest, he found only $800 left of his $8,000. He reported the theft to the police.

Defendant was cross-examined about another video taken in February 2021. In that video, defendant is holding an object in his hand. Defendant said he could not tell, did not remember, and was not sure whether the item depicted in the video was a gun in his hand.

The jury found defendant guilty of being a felon in possession of a firearm, and the court found defendant's strike allegations true. The court denied defendant's *Romero* motion. The court sentenced defendant to 32 months in state prison, which was the low term for the underlying charge doubled for the strike prior.

Defendant filed a timely notice of appeal.

6

## II.  DISCUSSION

### A.  *Impeachment*

Defendant contends the trial court erred in refusing to admit evidence of threatening statements L.B. made to E.G.  Those statements included L.B. would tell men it was acceptable to carry out rape fantasies with E.G. or even kill E.G.  We conclude the trial court did not abuse its discretion.

A trial court has discretion under Evidence Code section 352 to determine whether impeachment evidence should be admitted.  (*People v. Clark* (2011) 52 Cal.4th 856, 931.)  Under Evidence Code section 352, a trial court "may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

"A trial court's ruling to admit or exclude evidence offered for impeachment is reviewed for abuse of discretion and will be upheld unless the trial court 'exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' "  (*People v. Ledesma* (2006) 39 Cal.4th 641, 705.)  In that regard, "[t]rial judges retain 'wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.' "  (*Ibid.*)

As a general matter, the application of ordinary rules of evidence, including Evidence Code section 352, does not infringe on the right to present a defense. (*People v. Hall* (1986) 41 Cal.3d 826, 834.)  "Although completely excluding evidence of an accused's defense theoretically could rise to this level, excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense." (*People v. Fudge* (1994) 7 Cal.4th 1075, 1103.)  Indeed, neither the right to a fair trial nor the right to present a defense confer on defendant " 'a constitutional right to

7

present all relevant evidence in his favor, no matter how limited in probative value such evidence will be so as to preclude the trial court from using [section 352].' " (*People v. Babbitt* (1988) 45 Cal.3d 660, 684.) Likewise, notwithstanding the confrontation clause, a trial court may restrict cross-examination of a witness based on Evidence Code section 352. (*People v. Quartermain* (1997) 16 Cal.4th 600, 623.) "As we have advised, 'courts may and should consider with particular care whether the admission of [impeachment] evidence might involve undue time, confusion, or prejudice which outweighs its probative value.' " (*People v. Clark*, *supra*, 52 Cal.4th at p. 932.)

Here, we agree L.B.'s credibility was a material issue in this case. The trial court carefully weighed the proffered evidence and came to a reasoned conclusion that it was fair for the parties to inquire into L.B.'s activities of pimping based on the dispute whether L.B. required defendant to pay for sex. That evidence gave the jury a fair impression of her and did not provide the jury with a distorted record on her credibility.

At the same time, the trial court reasonably concluded the evidence L.B. may have threatened E.G. by telling E.G. that she would hire E.G. out for rape fantasy dates or tell the men they could kill her should be excluded. The trial court found the probative value of this evidence was outweighed by its overly graphic nature, was too collateral to the main issue at trial, and would result in an undue consumption of time at trial because more testimony would be required to explain the evidence and the context in which L.B. made the threats. The trial court discussed why it was excluding this evidence of threats L.B. made to E.G., applying the proper legal standards in Evidence Code section 352. The trial court imposed reasonable limits on cross-examination based on its determination that this further information was overly collateral to the disputed issues in this case -- whether defendant possessed the gun found in the garbage room next to L.B.'s apartment. This was not an abuse of discretion.

### B.       *Romero* Motion

Defendant next asserts the trial court abused its discretion in denying his motion to dismiss his prior two strikes pursuant to *Romero*.  We disagree.

#### i.       *Additional Facts*

At sentencing, defendant asked the trial court to dismiss his prior strike convictions pursuant to section 1385 and *Romero*.  In opposition, the People argued that defendant had been sentenced to 12 years in state prison for his two prior convictions for robbery and assault with a semiautomatic firearm.  Defendant had picked up five more cases, including two misdemeanor cases for obstructing police officers and a federal charge of being a felon in possession of a firearm.  And the video the People cross-examined defendant about demonstrated defendant likely had possessed a second firearm earlier in 2021.

In ruling on the *Romero* motion, the trial court stated, this is "a fairly straight forward analysis the Court needs to do under *Romero* and guided by the case of *People versus Williams* [(1998) 17 Cal.4th 148].  We need to look at the Defendant's background, character and prospects in order to determine whether or not the Defendant is somebody who comes within the spirit of the three strikes law or not."  (Italics added.)

In looking at defendant's background, the trial court noted defendant was a 36-year-old man who is currently in federal prison with a challenging background.  The trial court examined the crimes in defendant's background since 2007,  including his possession of a gun related to his prior strike convictions for assault with a semiautomatic firearm and robbery.  Defendant also had a misdemeanor conviction for assault in 2018, which apparently arose out of conduct in 2006.  Defendant had a gun in his 2007 conviction for resisting arrest.  Following that, he was arrested for gun possession, tried in federal court, and received a 32-month sentence in federal prison.  In 2019, defendant had a conviction for resisting or delaying a peace officer.  The trial court did not know how defendant behaved in prison, but assumed it was good.

In terms of defendant's prospects, the trial court noted he had the potential for future employment. Defendant had many friends and relatives who vouched for him in court.

Finally, in looking at defendant's character and summing up all of the relevant factors, the court said, "You know, when I look at this, to me it seems like he just doesn't seem to get it. He -- Why he always carries a gun, it seems like. [¶] In 2007 -- you think that would be a wake up call, that would be the end of it and no more after spending that much time in prison. But then there's the 2019 case. Okay. So one more mistake, maybe he still didn't get it. [¶] But then while that case is pending, he has our case. And, you know, I saw the videos. You can see the gun clearly on the countertop there. He shows up at this house, the apartment -- seems from the evidence I saw -- and he brought a gun with him. [¶] So why? What does that say about his character? That he has -- he always seems -- to me -- wants to have a gun in his possession. I don't know. Maybe he's scared of something. I'm not sure what his reasons are but it doesn't really matter because he's a felon and he can never have a gun again and yet he keeps -- he keeps violating this particular crime or Penal Code Section. [¶] So I look at him, . . . his age, who he is, where he's been, he's been years in prison up to this point. [¶] He's -- He does have friends and relatives, which is always a good sign. . . . People who have friends and family [who] love him are the most likely to succeed when getting out of prison but this is -- he's already in his second prison sentence now. I know he hasn't gotten out yet of this federal one but still I look at his background, his character, his prospects, who he is, where he's been, what he's done. [¶] And I will say that based on all that it's impossible for me to conclude anything other than the fact that he is in the spirit of the three strikes law. He is a repeat offender and particularly repeating the same type of offenses. Fortunately, no one has been hurt that I know of. Maybe in the robbery there was an injury. I don't know. I don't have all the facts on that but certainly there's always a level of psychological harm in a robbery like that with a gun but I don't know if

10

he actually shot anybody. I don't have any knowledge of that. [¶] But all in all, I think that he comes clearly within the provisions and spirit of the three strikes law as People versus Mr. Williams has instructed the Court to [assess] the Defendant. [¶] So I will deny the Romero Motion."

ii. Analysis

Trial courts have discretion under section 1385 to dismiss a prior strike when a defendant falls outside the spirit of the three strikes law. (*People v. Williams*, *supra*, 17 Cal.4th at p. 161.) As the trial court noted, it "must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*Ibid.*)

The court's discretion is circumscribed by the concept of "furtherance of justice," requiring the court to consider both the defendant's constitutional rights and the interests of society. (*People v. Superior Court (Romero)*, *supra*, 13 Cal.4th at p. 530.) Dismissal of a strike is a departure from the sentencing norm, and as such, we will not reverse the ruling on a *Romero* motion for an abuse of discretion unless the defendant shows the decision was "so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony* (2004) 33 Cal.4th 367, 377.) Where the trial court, aware of its discretion, " 'balanced the relevant facts and reached an impartial decision in conformity with the spirit of the law, we shall affirm the trial court's ruling, even if we might have ruled differently in the first instance.' " (*Id.* at p. 378.)

Here, the trial court was aware of the relevant law, its discretion to strike defendant's prior felony convictions, and it considered the relevant factors. First, the court looked at defendant's background, noting he was 36 years old and currently incarcerated in federal prison. The court went into extensive detail concerning

11

defendant's prior convictions from 2006 to present, including that four of those convictions involved guns. The court observed it was fortunate no one was hurt in any of defendant's crimes, implicitly acknowledging firearms in crimes carry the inherent danger of violence and injury or death.

The trial court gave defendant the benefit of the doubt that his behavior in prison was good. The trial court looked positively upon defendant's prospects concluding he had a solid support system of friends and family and the potential for employment when released.

Finally, the trial court looked at defendant's character. The trial court was concerned about defendant's repeated carrying of firearms when he knew he was not entitled to possess them. Four times he had been arrested and convicted for firearm offenses and the video evidence admitted at trial suggested there may be more times than that.

Based upon this analysis using the proper standard, the trial court reasonably concluded that defendant fell within the three strikes law.

### III. DISPOSITION

The judgement is affirmed.


                                          /s/
                                          MESIWALA, J.


We concur:


  /s/
ROBIE, Acting P. J.


  /s/
RENNER, J.