Filed 11/19/25  P. v. Dibkey CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Siskiyou)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JUSTIN LEE DIBKEY,<br><br>Defendant and Appellant. | C100600<br><br>(Super. Ct. No. SCCRCRF2022728) |

Following a jury trial, defendant Justin Lee Dibkey was convicted of numerous offenses and sentenced to an aggregate term of 16 years eight months.  On appeal, defendant contends the trial court erred in excluding certain evidence at trial, and that these errors deprived him of his constitutional right to present a defense.  Finding no merit to this contention, we affirm.

1

## I. BACKGROUND

The People charged defendant with assault with a firearm (Pen. Code, § 245, subd. (a)(2)),[1] grand theft of a firearm (§ 487, subd. (d)(2)), two counts of criminal threats (§ 422, subd. (a)), two counts of unlawful possession of a firearm (§ 29800, subd. (a)(1)), unlawful possession of ammunition (§ 30305, subd. (a)(1)), two counts of false imprisonment (§ 236), exhibiting a firearm (§ 417, subd. (a)(2)(B)), and battery on a cohabitant (§ 243, subd. (e)(1)). As to the assault with a firearm and one of the criminal threat counts, the People alleged that defendant personally used a firearm (§ 12022.5, subd. (a)). The People also alleged numerous aggravating circumstances.

Evidence presented at trial established that in May 2019 the victim met defendant at a club in California while defendant was in town for work. Defendant and the victim spent the weekend together in a romantic sexual relationship.

Two years later, in May 2021, the victim and defendant met up again. Defendant needed a place to stay, and the victim allowed him to live with her. The victim later wrote a letter to the Idaho Department of Corrections to request that defendant be able stay with her in California while he continued his parole.

After they moved in together, defendant started acting jealous and accused her of having sex with others, including her son's best friend. This accusation resulted in a physical altercation between defendant and the friend. After this altercation, the friend and one of the victim's sons called the victim and could hear defendant in the background threatening to kill them.

In another incident, defendant chest-bumped the victim down the hallway and up against a bookshelf, without her consent.

---

[1] Undesignated statutory references are to the Penal Code.

Defendant eventually asked the victim if he could move into a shed outside the home with another woman. The victim told defendant to get out of her house. Defendant later changed his mind and said he wanted to stay with the victim. The victim noticed defendant stopped sleeping and described him as angry, agitated, and delusional. Defendant began sleeping in the shed outside the house.

On June 19, 2022, defendant went into the house while the victim was in the backyard. Video footage from inside the house revealed that defendant went into the victim's bedroom and took her firearm out of her purse. When the victim realized the gun was missing, the victim pleaded with defendant to return the weapon. The victim went out to the shed and continued to ask him to give the gun back; defendant responded, "If I get to the count of three I'm going to shoot."

The victim proposed exchanging the gun defendant took with another gun she had that was difficult to shoot. This exchange ultimately occurred. But, according to the victim, defendant later went into the victim's room, put the gun in her face, pulled the trigger, and said "you fucking gave me a gun that doesn't work. You gave me a gun that doesn't shoot."

The victim testified that the next day, defendant was paranoid and agitated. He accused her of putting things on his phone. According to the victim, defendant suffered from delusions that the Illuminati were following him or that she was in the Illuminati. Defendant threatened to break every bone in her body and bury her in the backyard. The victim could see defendant had a gun in his waistband. The victim called the police and defendant was detained. The victim filed a restraining order the next day.

During cross-examination, the victim testified she was an attorney licensed in California who worked as a high-level manager and chief attorney for a local agency. The trial court sustained relevance objections to defense counsel's questions regarding whether the victim had maintained a state bar license from 1991 to the present and whether she always just worked in Siskiyou and Modoc Counties.

3

Defense counsel elicited testimony that the victim was a volunteer officer at the Elks Lodge. Defense counsel asked whether the victim was "the knight of justice" at that organization. The prosecution objected on relevance grounds, and defense counsel responded, "I think the jury would like to know who [the victim] is, what she does in the community." The prosecution objected that this was improper character evidence, and the trial court sustained the objection. The court also sustained a relevance objection as to whether the victim was active in the local bar association and whether the victim informed other members of county government on child support issues.

Defense counsel asked the victim several questions about her familiarity with parole regulations, including whether she understood that defendant was not permitted access to contraband of any kind. The prosecutor objected to most of these questions on relevance grounds, but the trial court overruled those objections.

Defense counsel asked the victim whether in her "initial intimate relationships did role playing come into being." The prosecution objected and argued, outside the presence of the jury, that the evidence was highly prejudicial and should be excluded under Evidence Code section 352. The prosecutor explained there was no evidence to suggest that roleplaying was involved in the events at issue and that the victim's sexual behavior was private. Defense counsel argued that the power dynamics were "part of the relationship," highlighting how defendant believed the victim to be royalty because in text exchanges the victim referred to defendant as "her king" and the victim considered herself a princess. The trial court told defense counsel that she needed to establish whether the victim's sexual lifestyle "involved violence between the two. You're causing an undue consumption of time. [¶] . . . [¶] You need to lay a foundation that it is relevant."

Back in court, the cross examination of the victim resumed:

"[Defense counsel]: . . . when you first met [defendant] you were involved in a fetish community where you were learning about power exchange; is that correct?

4

"[Prosecutor]: Objection, Your Honor, relevance.

"THE COURT: Overruled.

"[Victim]: I was recently divorced and I was exploring my sexuality as a 50-some-year-old woman. I felt that that was my freedom to do. [¶] . . . [¶]

"[Defense counsel]: Did you post pictures of yourself with bruises as part of this power exchange experience in a sexual context?

"[Prosecutor]: Objection, Your Honor, relevance. This doesn't directly pertain to [defendant] and [the victim].

"THE COURT: Sustained.

"[Defense counsel]: Did you in the context of this fetish sexuality get bruised by [defendant] at any time?

"[Victim]: I bruise very easily anyway. I walk into things and I bruise. I'm constantly bruised by being a klutz. [¶] So if he put hands on me even just grabbing my arm I would bruise.

"[Defense counsel]: Okay. And that would from time to time have been part of your intimate contact with [defendant]?

"[Prosecutor]: Objection, Your Honor, relevance. [¶] . . . [¶]

"THE COURT: . . . I'll give it a little leeway. Overruled. [¶] You may answer, if I understand the question.

"[Victim]: Not that – I'm sorry. Not that I specifically recall. [¶] . . . [¶]

"[Defense counsel]: And there's role playing involved in this sexual style; is that correct?

"[Victim]: For other people probably yes. There's a whole variety of sexuality for every walk of life.

"[Defense counsel]: And you identified yourself as a princess in this life?"

At this point, the prosecutor objected again and requested a sidebar. The prosecutor told the court it was just handed a piece of paper, which defense counsel

5

represented as being the victim's profile from Fetish Life. The court described the paper as "inappropriate picture, upper body of a woman" with a written statement "[l]ooking for a friend, partner, relationship, play partner. Princess by day, slut by night." The following exchange occurred:

"[Defense counsel]: She's looking for a master.

"THE COURT: That doesn't say that. A master to beat me up? It doesn't say that. [¶] . . . [¶] How is that probative of any – how is that probative of innocence or guilt?

"[Defense counsel]: I believe – I believe it is at minimum probative of her truthfulness, her credibility. I believe it is probative of her fear, her reasonable fear. I believe it is probative of whether or not this was a setup and the power exchange more broadly. [¶] . . . [¶]

"THE COURT: All right. I'm not seeing it probative at all except as inappropriate character evidence. As it shows she has a healthy sexual lifestyle. Like so many people in the modern world that's how they get out there and date. [¶] Otherwise, it's actually highly inappropriate, the avenue you're going down, without laying proper foundation . . . [¶] . . . [¶] [t]hat there's been a desire to get beat up and that's part of her lifestyle with guns shoved in her face and then that – that's her kink on the video. [¶] . . . [¶] Otherwise it's not probative at all."

Back in court, in response to a question of whether the victim ever referred to defendant as her king, the victim testified it was a term of endearment.

In closing argument, defense counsel described the victim as someone "exploring her sexuality and experimenting with modes of sexual expression." According to counsel, the victim met defendant and "a likely scenario given what we know and what [the victim] testified to is she approached him for a sexual liaison, was interested in consensual sex play of the fetish variety. [¶] She had identified, it appears, a playmate. He was interested. [¶] . . . [¶] She's a person in control. She's a person with power and

6

influence. She's a person somebody can listen to when they make an important decision about transferring his supervision. [¶] . . . [¶] We're here because an attorney, the chief officer of [a local] department, an alumni of the district attorney's office, has manipulated the system in which she has over 30 years experience to punish a lover she believed was unfaithful. It's that simple. [¶] . . . [¶] And [defendant] is vulnerable. You think about that wheel of control, power and control. He's particularly vulnerable. He's a parolee. . . . [¶] . . . [¶] [Defendant] must comply with [the victim's] demands or he loses his home. . . . [¶] . . . [¶] And this intimate relationship, the one you've heard about this last week, [the victim], the accuser, was the one with the power. [¶] There is no evidence that her sons were aware about this role playing, the switch. [¶] . . . [¶] . . . Chest slams. Is this part of the game? Is this sex? [¶] . . . [¶] Can you believe anything she says? . . . Does she have the experience and the skills to manipulate the system?"

In rebuttal, the prosecutor told the jury: "Now, what does the defense want you to believe, that [the victim] is not credible because she's a successful, contributing member of this community? That she's gross because she engages in sexual behavior that you didn't hear any evidence about? [¶] . . . [¶] . . . It's completely inappropriate character evidence to say, well, [the victim] isn't credible, she shouldn't be considered because she's into these aberrant sexual behaviors. That's not appropriate."

The jury found defendant guilty of assault with a firearm, grand theft of a firearm, both counts of being a felon in possession of a firearm, unlawful possession of ammunition, and both counts of criminal threats. The jury found true one of the personal use firearm allegations. The jury found defendant not guilty of both counts of false imprisonment and exhibiting a firearm. The jury further found defendant not guilty of battery on a cohabitant but guilty of the lesser included offense of simple assault (§ 240).

Defendant waived his right to a jury trial as to aggravating circumstances, and the trial court found most of the alleged aggravating circumstances true. The court sentenced defendant to 16 years eight months in prison as follows: (1) four years (the upper term)

for the assault with a firearm plus 10 years (the upper term) for the associated firearm enhancement; (2) eight months (one-third of the middle term) for grand theft of a firearm; (3) eight months for each count of criminal threats; (4) eight months for each count of unlawful possession of a firearm, one count of which was stayed pursuant to section 654; (5) eight months for unlawful possession of ammunition, stayed pursuant to section 654; and (6) one year concurrent for simple assault, stayed pursuant to section 654.

Defendant timely appealed.

## II.  DISCUSSION

Defendant argues evidentiary errors by the trial court deprived him of his constitutional right to present a defense.  In his briefs, defendant generally avoids challenging specific evidentiary objections.  Rather, defendant discusses categories of evidence that, in his view, he should have been permitted to explore in greater detail. Those categories include:  (1) "evidence regarding [the victim's] training and experience as an attorney, her prominence in the community and her position in government"; and (2) "evidence that [the victim] was involved in a fetish community, and that role-playing which involved [the victim] being a 'switch'—one who is sexually aroused by playing the role of either dominatrix or submissive—was at the center of much of the relationship with [defendant]."  In defendant's view, this evidence was plainly relevant because it:  (1) showed that "given her status in the community . . . she was clearly in the power position on the intimate partner violence continuum"; (2) showed that the victim "enjoyed somewhat violent sexual activities, and that some of the instances in which she claimed that [defendant] terrified her, were just part of their role-playing"; and (3) challenged the victim's credibility, established her motive to fabricate, and undermined her attempt to "paint herself as a sympathetic victim."

Only relevant evidence is admissible at trial.  (Evid. Code, § 350.)  " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact

8

that is of consequence to the determination of the action." (Evid. Code, § 210.)

Notwithstanding its relevance, the "court in its discretion may exclude evidence if its

probative value is substantially outweighed by the probability that its admission will (a)

necessitate undue consumption of time or (b) create substantial danger of undue

prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

Further, "evidence of a person's character or a trait of his or her character . . . is

inadmissible when offered to prove his or her conduct on a specified occasion." (Evid.

Code, § 1101, subd. (a).) " ' "We review for abuse of discretion a trial court's rulings on

relevance and admission or exclusion of evidence under Evidence Code sections 1101

and 352." ' " (*People v. Fuiava* (2012) 53 Cal.4th 622, 667-668.) " 'We will not reverse

a court's ruling on such matters unless it is shown " 'the trial court exercised its

discretion in an arbitrary, capricious, or patently absurd manner that resulted in a

manifest miscarriage of justice.' " ' " (*People v. Jones* (2017) 3 Cal.5th 583, 609.)

As a general matter, the application of ordinary rules of evidence, including

Evidence Code section 352, does not infringe on the right to present a defense. (*People

v. Hall* (1986) 41 Cal.3d 826, 834.) "Although completely excluding evidence of an

accused's defense theoretically could rise to this level, excluding defense evidence on a

minor or subsidiary point does not impair an accused's due process right to present a

defense." (*People v. Fudge* (1994) 7 Cal.4th 1075, 1103.) Indeed, neither the right to a

fair trial nor the right to present a defense confer on defendant " 'a constitutional right to

present all relevant evidence in his favor, no matter how limited in probative value such

evidence will be so as to preclude the trial court from using Evidence Code section

352.' " (*People v. Babbitt* (1988) 45 Cal.3d 660, 684.) Likewise, notwithstanding the

confrontation clause, a trial court may restrict cross-examination of a witness based on

Evidence Code section 352. (*People v. Quartermain* (1997) 16 Cal.4th 600, 623; see

*People v. Ledesma* (2006) 39 Cal.4th 641, 705 ["Trial judges retain 'wide latitude insofar

as the Confrontation Clause is concerned to impose reasonable limits on such cross-

9

examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant' "].)

We reject defendant's claim of constitutional error, as it "attempt[s] to inflate garden-variety evidentiary questions into constitutional ones." (*People v. Boyette* (2002) 29 Cal.4th 381, 427.) Here, the trial court's rulings did not constitute the complete preclusion of any defense but rather the rejection of certain evidence. To the extent defendant distinctly challenges the trial court's evidentiary rulings, we find no abuse of discretion.

Regarding the victim's professional background, evidence was introduced that the victim was a high-positioned attorney in Siskiyou and Modoc Counties. Defense counsel argued in summation that the victim was the person in the relationship with "power and influence." Defense counsel noted how the victim was "the chief officer of [a local] department [and] an alumni of the district attorney's office"; claimed that the victim "manipulated the system in which she has over 30 years experience to punish a lover she believed was unfaithful"; and asked the jury "[c]an you believe anything she says?" Defendant was thus not precluded from presenting this defense, as he expressly did so.

As noted, defendant largely fails to identify specific evidentiary objections that he believes were sustained in error. The only ones we have identified relating to the victim's professional background (in the portions of the record cited by defendant) pertain to: (1) whether the victim maintained a state bar license from 1991 to the present; (2) whether the victim always worked in Siskiyou and Modoc Counties; (3) the victim's specific position in a community organization; (4) whether the victim was active in the local bar association; and (5) whether the victim informed other members of county government on child support issues. We see no abuse of discretion in the trial court's rulings to exclude this evidence on relevance grounds or as improper character evidence—especially when, as to one of the objections, defense counsel told the court the

10

information was relevant because, "I think the jury would like to know who [the victim] is, what she does in the community."

Moreover, defendant generally fails to explain how the exclusion of this *specific* evidence precluded him from presenting a defense at trial. Defendant argues that questions regarding the victim's "training and experience with respect to California law" were relevant because they could be used to establish why the victim "was so 'panicked' that appellant had taken her firearm." In defendant's view, the victim violated criminal law and state bar rules by leaving a firearm where defendant could obtain it. But it was established that the victim was a practicing attorney and defense counsel was permitted to ask the victim about her familiarity with parole regulations. Defendant was not prevented from raising this point at trial.

We reach the same conclusion regarding the evidence about the victim's involvement in a fetish community. The trial court permitted this line of questioning to the extent defense counsel could establish that roleplaying or power dynamics contributed to the events at issue in the case. Defense counsel was permitted to ask whether the victim was "involved in a fetish community where [she was] learning about power exchange"; whether "in the context of this fetish sexuality" the victim got "bruised by" defendant; and whether this would have been part of the victim's "intimate contact" with defendant. The victim responded that she was "exploring [her] sexuality" but could not specifically recall whether this was part of her contact with defendant. Defendant cites to no instances in the record (nor have we identified any) where defense counsel asked if any of the incidents at issue—such as when defendant pointed a gun at the victim's face and pulled the trigger—were merely roleplay. Given this, the trial court did not permit more general questions about the victim's sex life or the introduction of the victim's online dating profile.

Again, we discern no abuse of discretion in the trial court's evidentiary rulings, and agree that, without the proper foundation, the evidence was of minimal probative

11

value, would result in an undue consumption of time, and constituted improper character evidence. Defendant submits this evidence was relevant to the victim's credibility. We fail to see how that is so. Defendant also insists the evidence was relevant to show that the victim "enjoyed somewhat violent sexual activities, and that some of the instances in which she claimed that appellant terrified her, were just part of their role-playing." But, as explained, the trial court allowed defense counsel to ask about the victim's involvement in the fetish community and to lay the foundation as to whether consensual roleplay explained the events at issue.

Further, defense counsel ultimately raised this defense in closing argument. Given the evidence that the victim was "involved in a fetish community," defense counsel suggested to the jury that "a likely scenario given what we know and what [the victim] testified to is she approached him for a sexual liaison, was interested in consensual sex play of the fetish variety." Defense counsel even argued that the incident involving "[c]hest slams" could have been a "game" or "sex."

Finally, defendant contends this evidence was also relevant because it is possible defendant's "ramblings" about the Illuminati were "simply a part of their . . . role playing which carried over from their sexual relationship to their quarrels outside the bedroom." Again, defense counsel was not prevented from asking the victim whether defendant's comments about the Illuminati were part of a roleplaying game.

12

## III.  DISPOSITION

The judgment is affirmed.

/S/

RENNER, J.

We concur:

/S/

EARL, P. J.

/S/

FEINBERG, J.